801 F.2d 46
 13 Media L. Rep. 1369
 Irving MACHLEDER and Flexcraft Industries, Inc., Plaintiffs,
Irving Machleder, Plaintiff-Appellee, Cross-Appellant,
v.
Arnold DIAZ, CBS Inc., WCBS-TV, Ann Sorkowitz, Frank Pivalo,
Thomas Gallagher and Dennis P. Coyne, Defendants,
CBS Inc., Defendant-Appellant, Cross-Appellee.
Irving MACHLEDER and Flexcraft Industries, Inc., Plaintiffs-Appellants,
v.
Arnold DIAZ, CBS Inc., WCBS-TV, Ann Sorkowitz, Frank Pivalo,
Thomas Gallagher and Dennis P. Coyne, Defendants,
Arnold Diaz, CBS Inc., WCBS-TV, Frank Pivalo, Thomas
Gallagher and Dennis P. Coyne, Defendants-Appellees.
 Nos. 864, 1006, Dockets 85-7917, 85-7943.
 United States Court of Appeals,
Second Circuit.
 Argued March 10, 1986.
Decided Sept. 10, 1986.
 
 Harold R. Tyler, Jr., New York City (Paul G. Gardephe, Patterson Belknap Webb & Tyler, New York City, Pamela G. Ostrager, Laura R. Handman, Coudert Brothers, New York City, of counsel), for defendant-appellant, cross-appellee CBS Inc.
 Robert A. Machleder, New York City (Marcia E. Kusnetz, Wien, Malkin & Bettex, New York City, of counsel), for plaintiff-appellee, cross-appellant Irving Machleder and plaintiff-cross-appellant Flexcraft Industries, Inc.
 Michael P. McDonald, American Legal Foundation, Washington, D.C., filed a brief amicus curiae.
 Cahill Gordon & Reindel, New York City (Dean Ringel, Floyd Abrams, Ellen H. Woodbury, New York City, Paula Jameson, New York City, Slade Metcalf, Squadron, Ellenoff, Plesent & Lehrer, New York City, Katharine P. Darrow, George Freeman, New York City, Ralph P. Huber, Sabin, Bermant & Blau, New York City, Harry M. Johnston, III, New York City, Sandra S. Baron, New York City, Sam Antar, New York City, Milford Fenster, Hall, Dickler, Lawler, Kent & Friedman, New York City, Muriel Henle Reis, New York City, all of counsel), filed a brief for amici curiae, Dow Jones & Co., Inc., News America Publishing Inc., The New York Times Co., Newark Morning Ledger Co., Time Inc., Nat. Broadcasting Co., Inc., Capital Cities/ABC, Inc., and Metromedia, Inc.
 Before KEARSE and CARDAMONE, Circuit Judges and POLLACK, District Judge.*
 CARDAMONE, Circuit Judge:
 
 
 1
 Plaintiffs brought defamation and false light invasion of privacy actions against CBS and several of its employees. After plaintiffs were awarded jury verdicts totaling over a million dollars in compensatory and punitive damages, this appeal ensued. Arrayed on either side of the issues to be decided are the competing concerns of the privacy rights of individuals on the one hand, and the constitutional guarantee of freedom of the press on the other. The private individual plaintiff claims that defendants made him the subject of a public news report that portrayed him in a false light and thereby infringed on his right to be left alone. The defendant responds that its report concerning plaintiff was not in fact false, and further urges that to hold the media liable for reporting which is not factually untrue will stifle freedom of the press by denying it the breathing space it needs to survive.
 
 
 2
 History suggests that individual rights to privacy are actionable when the media portrays an individual falsely, but not otherwise. Although Madison acknowledged in his day that the press was checquered with abuse of individual rights, he still spoke eloquently of its triumphs over error and oppression. L. Brant, James Madison Father of the Constitution 1787-1800, 469 (1950). And Jefferson also wrote from Paris: "Our liberty depends on freedom of the press, and that cannot be limited without being lost." Letter to Thomas Currie, (January 28, 1786), reprinted in 9 The Papers of Thomas Jefferson 215 (Boyd ed. 1954). Jefferson perceptively observed in a letter to Madison on July 31, 1788 that freedom of the press "will not take away the liability of the printers for false facts printed." 13 Id. at 442. First Amendment guarantees are not for the press alone, but for the benefit of all; to that end a "broadly defined freedom of the press [helps assure] the maintenance of our political system and an open society." Time, Inc. v. Hill, 385 U.S. 374, 389, 87 S.Ct. 534, 543, 17 L.Ed.2d 456 (1967). Hence, it would unjustifiably contradict the theory underlying that guaranteed freedom were the law to limit accurate reporting. In consequence, we hold that to sustain a false light invasion of privacy claim, such portrayal must be substantially false and offensive to an ordinary person. Here, because the portrayal of plaintiff as intemperate and evasive was neither actionable nor false, and further because the charge that he was falsely portrayed as an illegal dumper was not sustained by the jury on the defamation claim, this verdict cannot stand.
 
 I BACKGROUND
 A. Facts
 
 3
 On May 22, 1979 WCBS-TV, a Manhattan television station owned and operated by CBS, Inc. (CBS), aired a report on its 6 o'clock news dealing with the dumping of toxic chemicals at a site in Newark, New Jersey. The broadcast highlighted the investigation of CBS reporter Arnold Diaz, then WCBS-TV's New Jersey investigative correspondent, and focused on his interview with plaintiff, Irving Machleder, the owner of a company that uses hazardous chemicals in its blending operations. As a result of this broadcast, Machleder brought a diversity action in the United States District Court for the Southern District of New York (Duffy, J.) alleging libel, false light invasion of privacy, assault and battery, and trespass. A district court jury awarded the plaintiff $250,000 in compensatory damages and $1,000,000 in punitive damages on his false light privacy claim.
 
 
 4
 The invasion of Machleder's privacy that he claims cast him in a false light arose from what plaintiff alleges was Diaz' "ambush" or "confrontational" interview. Ambush interview is a derogatory descriptive term for a controversial investigative reporting technique in which a reporter and his news crew intercept an "unsuspecting newsworthy subject on the street and [bombard] him with incriminating accusations ostensibly framed as questions." Note, The Ambush Interview: A False Light Invasion of Privacy?, 34 Case W. Res.L.Rev. 72, 72 (1983). The events leading up to the broadcast of this particular news report began on May 21, 1979 when Diaz received a telephone tip from Michael Rosenberg, a then confidential source within the New Jersey Department of Environmental Protection, informing him of a hazardous dumpsite on Avenue P in Newark. Rosenberg had previously provided Diaz with reliable information concerning such sites. From January to May 22, 1979 Diaz had aired an award-winning series of 18 television reports on chemical waste dumping in New Jersey.
 
 
 5
 On May 22nd Diaz and a film crew went to Avenue P and there found a large, open area that was overgrown with weeds and strewn with hundreds of rusting 55-gallon drums. Many of the drums were labeled "hazardous" and "flammable." Some of them were leaking and their contents were trickling into a nearby waterway. A noxious odor pervaded the whole area. After surveying the site, Diaz and the film crew walked about 25 feet to a nearby building that was occupied by Flexcraft, a manufacturer of paints, adhesives and coatings. Diaz approached the building under the mistaken belief that the abandoned drums he had viewed a few moments earlier were on Flexcraft property. He later learned that the drums were on land owned by the Newark Housing Authority. As he approached the Flexcraft plant Diaz encountered Bruce Machleder, the manager of Flexcraft, who told Diaz "to go to the office" at the front of the building.
 
 
 6
 Diaz proceeded with his crew to the front of the Flexcraft building where he came upon Irving Machleder. Although the parties' accounts differ as to what transpired next, the substance of the testimony reveals that Diaz approached Irving Machleder--with audio and video cameras rolling--and asked him if he knew anything about the chemical barrels dumped next to his building. Machleder replied that he did not want to be filmed for television and began to move away. Diaz and his crew followed. Machleder became agitated, shouting "get that damn camera out of here ... I don't want, I don't need, I don't need any publicity." When Machleder reached the door of his office he said to Diaz, "We don't ... we didn't dump 'em;" Diaz asked, "Who did? and Machleder responded, "You call the Housing Department. They have all the information." According to Diaz, he was then invited into the office by Bruce Machleder, who told him that the presence of the barrels had previously been reported to the United States Coast Guard, the New Jersey Turnpike Authority, and the Newark Housing Authority.
 
 
 7
 After Diaz left the Flexcraft premises he immediately contacted Ann Sorkowitz, a CBS research assistant, asking her to verify Machleder's statements and to dig up any additional information about the barrels that she could. Meanwhile he went to Newark City Hall to make inquiries at the Mayor's office and the Fire Department. Later Diaz returned to the dumpsite and conducted an on-camera interview of a Newark Deputy Fire Chief, who confirmed that this was a hazardous chemical waste site. The reporter then returned with his crew to the WCBS-TV news studio in Manhattan, where he learned from Sorkowitz that two years earlier in 1977 Flexcraft had reported the existence of the 55-gallon drums to the Coast Guard and the Turnpike Authority.
 
 
 8
 At 4:30 p.m. on the afternoon of the interview, Irving Machleder telephoned CBS and spoke with CBS's counsel. Claiming that he was quite disturbed about his confrontation with Diaz, Machleder asked CBS to delay the broadcast. Counsel told Machleder that he could not stop the program, but that he would forward Machleder's request to the news desk. That evening Diaz' report, as noted, was televised on WCBS-TV's 6 o'clock Report. The following excerpts are relevant to our analysis.
 
 
 9
 ARNOLD DIAZ: "Now, just who owns these barrels, what's inside of them and how they got there I really don't know. But I do know there is a small business on the property over there, and I went inside to try to get some answers. So I went to the office of Flexicraft [sic], a company that uses chemicals to make art supplies, and found the manager outside."
 
 
 10
 FLEXICRAFT [sic] MANAGER: "Get that damn camera out of here."
 
 
 11
 * * *
 
 
 12
 * * *
 
 
 13
 ARNOLD DIAZ: "Just tell me why--why are those chemicals dumped in the back ..."
 
 
 14
 FLEXICRAFT [sic] MANAGER: "I don't want ... I don't need ... I don't need any publicity...."
 
 
 15
 ARNOLD DIAZ: "Why are the chemicals dumped in the back?"
 
 
 16
 FLEXICRAFT [sic] MANAGER: "We don't ... we didn't dump 'em."
 
 
 17
 ARNOLD DIAZ: "Who did?"
 
 
 18
 FLEXICRAFT [sic] MANAGER: "You call the Housing Department. They have all the information."
 
 
 19
 ARNOLD DIAZ: "The manager told me off camera that for years the city has known all about the problem of chemical dumping on the land. So I went to City Hall, where the Mayor's Assistant said the Fire Department would check out the problem immediately."
 
 
 20
 * * *
 
 
 21
 * * *
 
 
 22
 ARNOLD DIAZ: "Late this afternoon I was able to confirm that the owner of Flexicraft [sic] had told state and local authorities about the illegal dumping two years ago, and nothing' been done [sic]. The City of Newark says the State should clean it up. The State says they're investigating, but it's not necessarily their responsibility, because the Newark Housing Authority owns the lands. So the drums still sit there--still leaking."
 
 
 23
 On May 29, 1979 Machleder's attorney sent a letter to CBS demanding a retraction of the Diaz Report and, when CBS refused to retract any part of it, the present litigation was commenced. After service of the complaint, CBS moved for summary judgment dismissing it.
 
 B. Proceedings Below
 
 24
 In Machleder v. Diaz, 538 F.Supp. 1364 (S.D.N.Y.1982) (Duffy, J.), the district court applied New Jersey law and--in ruling on several motions--held that summary judgment was precluded by genuine issues of fact with respect to whether: (1) a reasonable person could conclude that plaintiffs Machleder and Flexcraft dumped the chemicals; (2) CBS acted with the requisite degree of fault in its news broadcast; (3) communication between a CBS employee and public officials was conditionally privileged; (4) CBS may have been liable for false light invasion of privacy; (5) one of the cameraman's alleged touching of Irving Machleder constituted assault. Judge Duffy also held that (6) CBS was not liable for intruding upon the seclusion of Irving Machleder or for giving improper publicity to his private life, and (7) implied consent for Diaz and his crew to be on Machleder's property precluded CBS' liability for trespass. Ruling on post-trial motions several years later, the district court held in Machleder v. Diaz, 618 F.Supp. 1367 (S.D.N.Y.1985) (Leisure, J.), that the jury's compensatory award of $250,000 on the false light invasion of privacy claim was neither excessive nor outrageous, that CBS acted with actual malice in broadcasting the report, and that the punitive damage award of $1,000,000 was not excessive.
 
 
 25
 CBS appeals from the compensatory and punitive damages verdict awarded by the jury for the false light invasion of privacy claim. CBS also appeals from each of the following orders: (1) the earlier denial of CBS's motion for summary judgment with respect to the false light claim; (2) the denial of CBS's motion in limine seeking to exclude prejudicial and irrelevant evidence regarding a broadcast by a network other than CBS; (3) the denial of certain requests to charge; (4) the denial of CBS's motion for a directed verdict; and (5) the denial of CBS's post-trial motions for judgment notwithstanding the verdict or for a new trial and for remittitur. Irving Machleder cross-appeals from the dismissal of his invasion of privacy claim on a theory of improper publicity given to private facts and Flexcraft cross-appeals from the dismissal of its trespass claim. No appeal has been taken from the district court's dismissal of Machleder's libel claim after the jury rendered a verdict in favor of CBS or his assault and battery claim.
 
 II CHOICE OF LAW
 
 26
 As a threshold matter it is necessary to decide what law should govern. CBS argues that the district court erred when it applied New Jersey law. We disagree. Because New York was the forum state, the motions judge properly looked to its choice of law rules to determine which state's substantive law to apply. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496-97, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941); Mattox v. News Syndicate Co., 176 F.2d 897, 900 900 (2d Cir.), cert. denied, 338 U.S. 858, 70 S.Ct. 100, 94 L.Ed. 525 (1949). Under New York law a court must apply the substantive tort law of the state that has the most significant relationship with the occurrence and with the parties. Babcock v. Jackson, 12 N.Y.2d 473, 482, 240 N.Y.S.2d 743, 752, 191 N.E.2d 279, 288 (1963).
 
 
 27
 CBS accurately asserts that New York has a strong interest in this litigation, because WCBS-TV is located there, the subject broadcast emanated in Manhattan, and the day-to-day professional activities of CBS are conducted in New York. Yet New Jersey has superior contacts. Irving Machleder was interviewed in New Jersey; the news report was part of a series prepared by CBS's New Jersey reporter; the report aired throughout Northern New Jersey and the tri-state New York City metropolitan area; Irving Machleder is a resident of New Jersey, and Flexcraft is incorporated in New Jersey where it also maintains its principal place of business. Judge Duffy correctly concluded:
 
 
 28
 [D]espite the interest of New York in establishing a standard of fault for its news media, New Jersey also has an important competing interest in protecting its citizens from defamation. Coupled with New Jersey's additional interest in governing the fault of those who come within its boundaries to investigate the news and later broadcast it there, these factors call for the application of New Jersey law.
 
 
 29
 538 F.Supp. at 1370.
 
 III FALSE LIGHT PRIVACY
 
 30
 In order to resolve the issues presented by this appeal, it is helpful to discuss briefly several broad questions before focusing our analysis on the case at hand. Since this appeal concerns a false light invasion of privacy claim, we examine first that tort's elements and defenses, particularly focusing upon whether truth is a defense to a false light claim. Second, we discuss whether--if truth is such a defense--the false light privacy tort has been swallowed-up by and is now synonymous with defamation leaving behind no distinctive identity of its own.
 
 A. Common Law Approach to Privacy
 
 31
 Invasion of privacy was first discussed by American legal scholars 96 years ago when two distinguished Bostonians authored an article that recognized as an actionable tort the invasion of a person's privacy. Warren & Brandeis, The Right to Privacy, 4 Harv.L.Rev. 193 (1890). Rumored to be inspired by Warren's indignant reaction to a gossip column reporting on a family member's wedding breakfast, this influential article has left a permanent imprint on our tort law jurisprudence. See Zimmerman, Requiem For a Heavyweight: A Farewell to Warren and Brandeis's Privacy Tort, 68 Cornell L.Rev. 291, 295-96 (1983). Seventy years later Dean Prosser surveyed the impact of the new "right to privacy" tort on the law and found that it had been accepted by the overwhelming majority of American courts. Most significant was his conclusion that the invasion of privacy did not give rise to a single tort claim, but rather made actionable the invasion of four distinct privacy interests, which he described as: (1) intrusion upon solitude; (2) public disclosure of embarrassing facts; (3) publicly casting plaintiff in a false light; and (4) appropriation of plaintiff's name or likeness. Prosser, Privacy, 48 Calif.L.Rev. 383, 389 (1960).
 
 
 32
 Because Warren and Brandeis were primarily concerned that the press was "overstepping in every direction the obvious bounds of propriety and decency" and publishing "column upon column [that] is filled with idle gossip, which can only be procured by intrusion upon the domestic circle," Warren & Brandeis, supra, at 196, it is clear that the generalized right to privacy they had formulated--without defining it--conforms to the second category identified by Dean Prosser, that is to say, the public disclosure of private facts. Zimmerman, supra, at 295. Warren and Brandeis concluded that the truth of the matter published does not afford a defense. "Obviously this branch of the law should have no concerns with the truth or falsehood of the matters published." Warren & Brandeis, supra, at 218. This statement, of course, had application only to the tort that the authors intended to remedy. Thus, as conceived, this second type of invasion of privacy--the public disclosure of private facts--did not require falsity to state a cause of action. Prosser, Law of Torts 814 (4th ed. 1971).
 
 
 33
 Yet, in Dean Prosser's third category--false light, with which we are here concerned--a different rule has evolved in the common law. To establish a false light cause of action the published matter must be false--and, in addition, it must be highly offensive to a reasonable person.
 
 
 34
 The first requirement is that the published material contain a false portrayal. The very name of this tort, "false light", indicates that something false must be demonstrated, and the commentators agree that falsity must be shown to state a false light cause of action. Prosser, On Torts, supra, at 814; Restatement (Second) of Torts Sec. 652E comment b (1977). For 150 years the common law of England recognized the tort of false light invasion of a person's privacy and required a showing of falsity before an injunction would issue. In Byron v. Johnston, 35 Eng.Rep. 851 (1816), a publisher advertised for sale certain poems that he represented as being the work of the famous English poet, Lord Byron who, as plaintiff, succeeded in obtaining an injunction restraining their publication because the poems were falsely held out to be his works. Moreover, we recently held that "[i]n a false light case ... the gravamen of the tort is falsity ..." Lerman v. Flynt Distributing Co., Inc., 745 F.2d 123, 135 (2d Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985).
 
 
 35
 It follows logically that if falsity is required to state a false light claim, truth must be a defense. It is at this pivotal juncture that a false light claim parts from the other three invasions of an individual's right to privacy--intrusion, public exposure of private facts and appropriation--and moves closer to the common law tort of defamation. Warren and Brandeis themselves recognized that the "right to privacy does not prohibit the communication of any matter, though in its nature private, when the publication is made under circumstances which would render it a privileged communication according to the law of slander and libel. Warren & Brandeis, supra, at 216. Truth is now considered one of those privileges. Prosser, On Torts, supra, at 814. In consequence, truth--as it is in defamation--is a complete defense to a false light invasion of privacy cause of action. See Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 499, 95 S.Ct. 1029, 1048, 43 L.Ed.2d 328 (1975) (Powell, J., concurring).
 
 B. New Jersey's Falsity Requirement
 
 36
 New Jersey has adopted the common law approach set forth in the Restatement (Second) of Torts, Sec. 652E which requires falsity to sustain a cause of action for false light invasion of privacy. Cibenko v. Worth Publishers, Inc., 510 F.Supp. 761, 766 (D.N.J.1981) (applying New Jersey law); Bisbee v. John C. Conover Agency Inc., 186 N.J.Super. 335, 341-42, 452 A.2d 689, 692 (App.Div.1982). Section 652E of the Restatement provides:
 
 
 37
 One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
 
 
 38
 (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
 
 
 39
 (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. (emphasis added).
 
 
 40
 For liability to attach under Section 652E the published matter must be false, though not necessarily defamatory. Cibenko, 510 F.Supp. at 766; accord Rinsley v. Brandt, 700 F.2d 1304, 1307 (10th Cir.1983). Comment A to Sec. 652E states, "[I]t is essential to the rules stated in this Section that the matter published concerning the plaintiff is not true." See Bisbee, 186 N.J.Super. at 342, 452 A.2d at 692 ("This tort form of invasion of privacy is analogous to defamation, in that the statement which gives rise to the cause of action must be untrue."); Cibenko, 510 F.Supp. at 766.
 
 
 41
 C. First Amendment Limitations on False Light Claims
 
 
 42
 1. Such Claims Require Falsity and Requisite Fault
 
 
 43
 In order for a plaintiff to succeed on a false light claim without undulyimpinging on the First Amendment guarantees of freedom of the press, falsity and the requisite level of fault must be demonstrated. In Time, Inc. v. Hill, 385 U.S. at 374, 87 S.Ct. at 534, the Supreme Court considered a false light invasion of privacy action involving a New York statute which provided a cause of action to a person whose name or picture was used by another without consent for purposes of trade or advertising. It ruled that "the constitutional protections for speech and press preclude the application of the New York statute to redress false reports of matters of public interest in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth." Id. at 387-88, 87 S.Ct. at 542 (emphasis added). Because the New York courts had construed the relevant statute to allow truth as a complete defense when the publication involved a matter of public interest, the Court did not address whether the First Amendment would be violated if truth were not a defense to this kind of privacy claim. Id. at 383-84. Yet, because the fault standard devised by the Court requires knowledge of or reckless disregard of falsity, the logic seems inescapable that the First Amendment also requires a plaintiff to prove falsity.
 
 
 44
 Again, in Cantrell v. Forest City Publishing Co., 419 U.S. 245, 248, 95 S.Ct. 465, 468, 42 L.Ed.2d 419 (1974), the Court addressed a false light claim in which it was conceded that the offending newspaper article contained a number of false statements and inaccuracies. It stated that the subject article contained " 'calculated falsehoods,' and the jury was plainly justified in finding that [a news reporter] had portrayed the Cantrells in a false light through knowing or reckless untruth." Id. at 253, 95 S.Ct. at 1470-71 (emphasis added). In Gertz v. Robert Welch, Inc., 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974), it was held that when the plaintiff is a private individual the states could define for themselves the appropriate standard of liability for a publisher of defamatory falsehoods, so long as the states did not impose liability without fault. Gertz raised without deciding whether in subsequent cases an actual malice or a negligence standard should be applied in a false light action commenced by a private individual against a media defendant. As in Cantrell, the jury here found that the more stringent actual malice standard had been satisfied. We need not decide this issue because, as will be shown, there was no evidence on which a reasonable jury could find that the broadcast portrayed the plaintiff in a false light. It may be that in future privacy cases courts will apply the less stringent "negligence" standard used in defamation cases brought by private figures. See Hill, Defamation and Privacy Under the First Amendment, 76 Colum.L.Rev. 1205, 1274 (1976).
 
 
 45
 Regardless of the particular fault standard to be applied, it is clear that when publishing or broadcasting a newsworthy matter of public interest a media defendant may not be held liable for the tort of false light invasion of a person's privacy without proof of falsity and some level of fault. Cf. Philadelphia Newspapers, Inc. v. Hepps, --- U.S. ----, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (First Amendment requires a plaintiff to prove falsity in defamation cases. Falsity may never be presumed nor may defendant be required to prove truth.).
 
 
 46
 2. Falsity Requirement Safeguards Editorial Freedom
 
 
 47
 It is a truism that effective news reporting involves editing and that the editing process obviously entails professional judgment. In this process material that is flattering or critical of a particular person may be included or eliminated. In Pittsburgh Press Co. v. Human Rel. Comm'n., 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), the Supreme Court--approving a bar against employment advertising specifying "male" or "female"--emphasized the importance of independent editorial judgment. It prohibited "any restriction whatever, whether of context or layout, on stories or commentary originated by [the newspaper], its columnists, or its contributors." The Court reaffirmed "unequivocally the protection afforded to editorial judgment and to the free expression of views on these and other issues, however controversial." Id. at 391, 93 S.Ct. at 2562.
 
 
 48
 Irving Machleder asserts that CBS deliberately created a false light portrayal of him in order to sensationalize an "otherwise uneventful story." He argues that, in furtherance of this goal, CBS selectively chose those parts of the interview that tended to portray him as intemperate and evasive or as an illegal dumper, and excised those portions that would explain his behavior. For example, Machleder pointed out that CBS cut from the news report his statement, "I don't want to be on television, I'm sorry, I'm sorry," preferring the subsequent more hostile and incriminating statement, "Get that damn camera out of here." He maintains that had the broadcast included the earlier statement, the viewing audience would have understood the later statement to be the result of intimidation and pressure rather than an implied admission of guilt.
 
 
 49
 Although plaintiff's argument has superficial merit, recovery for a false light tort may not be predicated on a rule that holds a media defendant liable for broadcasting truthful statements and actions because it failed to include additional facts which might have cast the plaintiff in a more favorable or balanced light. To permit recovery in such circumstances violates the First Amendment since "[t]he choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials--whether fair or unfair--constitute the exercise of editorial control and judgment." Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 258, 94 S.Ct. 2831, 2840, 41 L.Ed.2d 730 (1974); see Virgil v. Time, Inc., 527 F.2d 1122, 1129 (9th Cir.1975); Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 132, 448 A.2d 1317, 1331 (1982). ("As long as the matter published is substantially true, the defendant was conditionally protected from liability for a false light invasion of privacy, regardless of its decision to omit facts that may place the plaintiff under less harsh public scrutiny.").
 
 
 50
 In Miami Herald, the Court examined whether a Florida statute requiring newspapers to grant political candidates equal access to reply to criticism violated the First Amendment. A candidate for the Florida House of Representatives demanded that the Miami Herald print verbatim his replies to two editorials critical of his candidacy. Upon the newspaper's refusal, the candidate brought suit under the Florida statute. The issue was framed in terms of "[c]ompelling editors or publishers to publish that which 'reason' tells them should not be published...." Id. 418 U.S. at 256, 94 S.Ct. at 2839. Acknowledging that a "responsible press is an undoubtedly desirable goal," id., the Supreme Court ruled that "the Florida statute fails to clear the barriers of the First Amendment because of its intrusion into the function of editors." Id. at 258, 94 S.Ct. at 2839.
 
 
 51
 A court cannot substitute its judgment for that of the press by requiring the press to present an article or broadcast in what the court believes is a balanced manner. It may only assess liability when the press so oversteps its editorial freedom that it contains falsity and does so with the requisite degree of fault.
 
 
 52
 3. False Light and Defamation are Separate Torts
 
 
 53
 Having established that principle, we turn to examine whether any vitality remains in the false light privacy tort when injury to reputation is at stake. Because both the defamation and false light privacy torts share the common elements of publication and falsity, a good deal of overlapping exists between them. But important distinctions remain so that the answer to the question of whether the older tort claim has swallowed whole the newer is "no". Yet, in many cases a successful false light claim might also give rise to liability for defamation. For example, while a false light claim may be defamatory, it need not be. Cibenko, 510 F.Supp. at 766; Fogel v. Forbes, Inc., 500 F.Supp. 1081, 1088 (E.D.Pa.1980); Wade, Defamation and the Right of Privacy, 15 Vand.L.Rev. 1093, 1107-08 (1962). Further, false light law makes no distinction between oral or written words as defamation does. Nor is there a distinction in privacy invasion false light cases between slander per se and slander requiring proof of special damages. Wade, supra, at 1111-12. In addition to these substantive distinctions, there are procedural differences. For instance, the burden of proof in a defamation case is preponderance of the evidence, while in false light litigation it takes clear and convincing evidence to establish the claim.
 
 IV FALSE LIGHT CLAIM IN THIS CASE
 A. Jury Instructions
 
 54
 With the above principles in mind we turn to the facts of this case. The first issue to be addressed is whether the news account giving rise to the claim was false. In order to answer this question, we begin by examining the trial court's charge to the jury on defamation and false light, and then scrutinizing the jury verdict sheet.
 
 
 55
 Irving Machleder alleges that CBS's broadcast was defamatory--depicting him and Flexcraft as being responsible for the illegal dumping. Machleder asserts that the news report did this by certain false statements, such as identifying the dump site as "527 Avenue P," which is Flexcraft's address, and by presenting the information in a manner that would cause a reasonable person to infer--considering the broadcast as a whole--that plaintiffs dumped the hazardous chemical drums on the overgrown adjacent site.
 
 
 56
 With respect to plaintiff's defamation claim, the district court judge charged the jury:
 
 
 57
 For you to award either Irving Machleder or Flexcraft Industries your verdict, you must find that (1) the defendants broadcast a statement of fact that the average viewer would reasonably understand as a defamatory statement about plaintiffs Irving Machleder and/or Flexcraft Industries; (2) that the statement of fact concerning Irving Machleder and/or Flexcraft Industries was substantially false ... false in some material respect; and (3) that the report was broadcast with the requisite degree of fault [negligence]....
 
 
 58
 On its verdict sheet the jury found that though the CBS broadcast contained defamatory statements of fact concerning Irving Machleder, he failed to prove that any of the defamatory statements was substantially false. Based on this finding the district court properly dismissed plaintiff's defamation claim.
 
 
 59
 In the second count of his complaint Machleder alleges that the May 22, 1979 broadcast cast him in a false light by portraying him as being "intemperate and evasive" or as an illegal dumper of chemical wastes. The district court instructed the jury:
 
 
 60
 For you to find for plaintiff Machleder on his false light claim, plaintiff must first establish that the broadcast, viewed as a whole, portrayed him as intemperate and evasive or as an illegal dumper of chemical wastes; and, second, that those portrayals would be highly offensive to a reasonable person.
 
 
 61
 The court went on to explain that if these two preliminary requirements were met, plaintiff then must establish that such portrayal or portrayals was substantially false. Finally, in order for Machleder to succeed, the court instructed the jury that he must prove by clear and convincing evidence that CBS broadcast the story with actual malice.
 
 
 62
 The district court charged the jury that "if you find the broadcast portrayed only what was substantially accurate, the fact that such substantially accurate statements of fact may have embarrassed plaintiff Machleder is not a basis for a verdict for plaintiff Machleder on his 'false light' claim." An examination of the jury verdict sheet[1] reveals a seeming inconsistency. Specifically, the jury found on the false light claim that the plaintiff proved by clear and convincing evidence that he was portrayed in a false light by the broadcast and that the defendants knew that the broadcast portrayed him in a false light or had reckless disregard as to the truth of the portrayal. These findings are apparently irreconcilable with the jury's findings on the defamation claim that the defamatory statements of fact were not substantially false. A broadcast cannot cast the plaintiff in a false light unless it is substantially false. See Lerman v. Flynt Distributing Co., Inc., 745 F.2d at 135. The role of the appellate court is to adopt a view of the case--if there is one--that resolves any seeming inconsistency in the jury's verdict. See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines Ltd., 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962); Martell v. Boardwalk Enterprises, Inc., 748 F.2d 740, 748 (2d Cir.1984).
 
 
 63
 There is one theory for reconciling the jury's verdict as to the false light claim and the libel claim. In support of his false light claim, the plaintiff alleged that the broadcast portrayed him as intemperate and evasive or as an illegal dumper. In contrast, his defamation claim was based on the allegation that he was portrayed as an illegal dumper. Thus, the jury could have found that the plaintiff was an illegal dumper, but was not, as portrayed, intemperate and evasive.
 
 
 64
 In reviewing the denial of plaintiff's motion for judgment notwithstanding the verdict, we must view the evidence in the light most favorable to the plaintiff to determine whether the evidence was sufficient to allow a reasonable juror to conclude that there was falsity in the portrayal of the plaintiff as intemperate and evasive. See Schwimmer v. Sony Corp. of America, 677 F.2d 946, 951-52 (2d Cir.), cert. denied, 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982).
 
 
 65
 Here we find that the evidence was insufficient. Any portrayal of plaintiff as intemperate and evasive could not be false since it was based on his own conduct which was accurately captured by the cameras. Further, the only evidence on plaintiff's temperment came from a business associate who, though he had done business with the plaintiff, saw Machleder only for 15 minutes every three months. This was clearly insufficient evidence to establish that the film showing plaintiff's actions depicted him in a false light. Since proof of falsity was required, and the film footage (virtually unedited except for omission from the interview of plaintiff's statement, "I don't want to be on television, I'm sorry, I'm sorry," according to CBS's uncontroverted allegation) was accurate, the false light claim must fail.
 
 B. Highly Offensive Standard
 
 66
 Having found that the district court erred in not granting defendant's judgment notwithstanding the verdict, we discuss briefly whether the published matter was highly offensive to a reasonable person, merely to indicate that a portrayal of this type--even had it been false--would not give rise to liability on a false light claim.
 
 
 67
 Comment C to the Restatement of Torts Sec. 652E makes clear that "[i]t is only when there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position, that there is a cause of action for invasion of privacy." See Devlin v. Greiner, 147 N.J.Super. 446, 462, 371 A.2d 380, 390 (Law Div.1977); Prosser, Privacy, supra, at 396-97.
 
 
 68
 [1112] We hold that the district court that ruled on the motions erred in concluding that the "alleged portrayal of Machleder as intemperate and evasive in response to Diaz's questions [could not] be deemed inoffensive as a matter of law," Machleder v. Diaz, 538 F.Supp. at 1375, and in denying summary judgment on the false light claim on that basis. By the same token, the trial court erred in denying CBS' motions for a directed verdict and judgment notwithstanding the verdict since no reasonable juror could have concluded that the alleged portrayal was highly offensive. Under New Jersey law a court may determine as a matter of law that a publication is "not reasonably capable of conveying the offensive meaning or the innuendo ascribed by plaintiff as the basis for his invasion of privacy claim." Cibenko, 510 F.Supp. at 767; Bisbee, 186 N.J.Super. 335, 342, 452 A.2d at 692.
 
 
 69
 In order to avoid a head-on collision with First Amendment rights, courts have narrowly construed the highly offensive standard. A brief review of several cases illustrates that the alleged portrayal of Irving Machleder as intemperate and evasive fails to meet such standard. Those decisions that have found false light portrayals offensive to a reasonable person are considerably more insulting than CBS's portrayal of Irving Machleder. Cantrell, 419 U.S. at 247-48, 95 S.Ct. at 467-68 (false portrayal of private individual and her family as destitute exposed them to ridicule and pity); Time, Inc. v. Hill, 385 U.S. at 378, 87 S.Ct. at 537 (false portrayal of family held hostage, depicting violence and verbal sexual insult); Douglass v. Hustler Magazine, Inc., 769 F.2d 1128 (7th Cir.1985) (unauthorized use of model's nude photograph in Hustler Magazine falsely portrayed her as a lesbian and willing to be associated with Hustler magazine). Again, courts have declined to recognize portrayals as highly offensive in cases more egregious than Machleder's. See Virgil v. Sports Illustrated, 424 F.Supp. 1286, 1289 (S.D.Cal.1976) (article reporting plaintiff's exploits, including putting out cigarettes in his mouth, diving off stairs to impress women, hurting himself in order to qualify for unemployment insurance so as to have time for body surfing, and participating in gang fights and eating insects was not offensive enough to preclude being considered newsworthy); Arrington v. NY Times Co., 55 N.Y.2d 433, 441-42, 449 N.Y.S.2d 941, 434 N.E.2d 1319 (1982) (even if New York were to recognize a false light claim, unauthorized use of private individual's photograph to illustrate " 'materialistic, status-conscious' " black middle class, does not measure up to the highly offensive standard).
 
 V CROSS APPEALS
 
 70
 Machleder cross-appeals from the district court's dismissal of his invasion of privacy claim on the theory of improper publicity given to private facts and Flexcraft cross-appeals the dismissal of its trespass claim. Both of these appeals are without merit. We examine the publication of private facts claim first.
 
 
 71
 The definition of this theory of liability for invasion of privacy is set forth in the Restatement (Second) of Torts Sec. 652D.
 
 
 72
 One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public.
 
 
 73
 The district court dismissed this claim because the encounter between Diaz and Machleder "took place in a semi-public area while plaintiff knew the cameras were rolling. Defendant is subject to no liability for giving further publicity to that which plaintiff leaves open to the public eye." Machleder v. Diaz, 538 F.Supp. at 1374 (citing Restatement (Second) Torts, Sec. 652D, Comment b). Thus, for this reason, and because the published matter was not highly offensive, this claim was properly dismissed.
 
 
 74
 Second, plaintiffs assert that the district court erred when it granted summary judgment dismissing the trespass claim. Diaz and the camera crew entered the Flexcraft premises peacefully; there were no signs warning them to keep off the property. Neither of the Machleders asked Diaz and his crew to leave. See Martin v. Struthers, 319 U.S. 141, 147, 63 S.Ct. 862, 865, 87 L.Ed. 1313 (1943) ("Traditionally the American law punishes persons who enter onto the property of another after having been warned by the owner to keep off"); Cooley, On Torts, Sec. 248 at 239 (one may visit another's place of business without incurring liability, unless he is warned away by placard or otherwise.); Snyder v. I. Jay Realty Co., 30 N.J. 303, 153 A.2d 1 (1959) (guests of factory employees were not trespassers where factory owner had not posted sign).
 
 
 75
 When Diaz met Bruce Machleder at the side door of the Flexcraft plant, Machleder told him to go around to the front office. This express invitation to come on to the property converted Diaz' status to that of invitee. Even if only a licensee, Diaz was certainly not a trespasser. Restatement (Second) of Torts Sec. 332, comment b. Although Irving Machleder expressed anger at being filmed and questioned, this did not negate consent. Hence, the district court correctly dismissed the trespass claim.
 
 VI CONCLUSION
 
 76
 Because the jury found in plaintiff's libel action that the defamatory statements, i.e., of illegal dumping, were not substantially false, the illegal dumping portrayal will not support a false light verdict. As a matter of law, we conclude that the portrayal of Irving Machleder as intemperate and evasive is not false and is not highly offensive to a reasonable person. Thus, on either ground a finding of liability for false light invasion of privacy must be reversed and the action dismissed. Reversing the false light verdict also makes unnecessary an examination of defendant's other related challenges.
 
 
 77
 The judgment of the district court awarding compensatory and punitive damages for a false light invasion of privacy is reversed and plaintiff's complaint dismissed. The dismissal by the district court of the causes of action for improper publicity given to private facts and for trespass is affirmed.
 
 
 
 *
 Hon. Milton Pollack, Senior United States District Court Judge, Southern District of New York, sitting by designation
 
 
 [1]
 A comparison of jury findings on the defamation claim with its findings on the false light claim reveals this
 Findings on Libel Claim
 
 
 [1]
 Do you find that plaintiff Irving Machleder has proved by a preponderance of the evidence that the May 22, 1979 broadcast would be understood by the average viewer to contain defamatory statements of fact concerning plaintiff Machleder? Yes
 
 
 [2]
 Do you find that plaintiff Irving Machleder has proved by a preponderance of the evidence that any defamatory statements of fact concerning him in the May 22, 1979 broadcast were substantially false? No
 
 
 [4]
 Do you find that plaintiff Flexcraft Industries, Inc. has proved by a preponderance of the evidence that the May 22, 1979 broadcast would be understood by the average viewer to contain defamatory statements of fact concerning plaintiff Flexcraft? Yes
 
 
 [5]
 Do you find that plaintiff Flexcraft Industries has proved by a preponderance of the evidence that any defamatory statements of fact concerning the company in the May 22, 1979 broadcast were substantially false? No
 Findings on False Light Claim
 
 
 [11]
 Do you find that plaintiff Irving Machleder has proved by clear and convincing evidence that he was portrayed in a false light by the May 22, 1979 broadcast? Yes
 
 
 [12]
 Do you find that plaintiff Irving Machleder has proved by clear and convincing evidence that such false light portrayal would be highly offensive to persons of ordinary sensibilities? Yes
 
 
 [13]
 Do you find that plaintiff Irving Machleder has proved by clear and convincing evidence that defendants Arnold Diaz and CBS, Inc. knew that the May 22, 1979 broadcast portrayed plaintiff Machleder in a false light highly offensive to persons of ordinary sensibilities or had reckless disregard as to the truth of the portrayal? Yes