The MERTON COMPANY, LIMITED, Plaintiff,

v.

PEPSICO INC., Defendant.

No. 92 CV 6565.

United States District Court, S.D. New York.

Feb. 7, 1995.

Decision: Observations on the Jurisprudence of Professor [Harry W.] Jones, 28 Catholic UL Rev 199 (Summer 1993).

Norman Weiss, Elyse Strauss, Osrolenk, Faber, Gerb, Soffen, New York City, for plaintiff.

Jonathan C. Thau, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW

PARKER, District Judge.

This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court after a bench trial. Plaintiff, The Merton Company, Ltd. ("Merton"), brought this lawsuit against Defendant, PepsiCo Inc. ("PepsiCo"). Merton asserts two claims against PepsiCo: the tort of negligent misrepresentation and breach of contract.

### A. *FINDINGS OF FACT*

1. Merton, a manufacturer of toys and related items, is a Hong Kong corporation with its principal place of business in Hong Kong. PepsiCo, is a New York corporation with its principal place of business in Purchase, New York. The matter in controversy, exclusive of interest and costs, exceeds $50,000.00.

2. Merton maintains its executive offices in Hong Kong. Merton has a factory in Mainland China that employs over 5,000 workers. Merton is in the business of manufacturing various novelty items, including so-called "premium" items—items that often accompany promotional campaigns. These items are used from time to time by companies such as McDonald's, Mars, Burger King or Denny's.

3. Merton's Managing Director (the equivalent of a Corporate President here in the United States) is Peter Keller, who was born and raised in the United States and graduated from an American University.

4. PepsiCo is, among other things, the manufacturer and distributor of "concentrate" from which soft drinks are manufactured. PepsiCo has operations throughout the world, and is comprised of various different divisions and subsidiaries that focus on various areas of PepsiCo's business. One such division is PepsiCo's Latin American Division ("Pepsi LAD"), which focuses on sales and marketing activities in various of the Latin American countries. Another division is Pepsi World Trade which concentrates on currency exchange and trade balance issues.

5. PepsiCo, like many companies, considers numerous potential promotional matters, only some of which actually ever proceed to fruition. During 1991, Pepsi LAD was involved in considering a potential promotional campaign known as the "Pepsi Gang" project, which, in essence, involved consideration of the production of certain figurines that would be designed to represent positive characteristics associated with various PepsiCo beverages. Working with Pepsi LAD in considering the Pepsi Gang project was the CDM Company ("CDM"), a California-based marketing company. This litigation had its genesis in the Pepsi Gang project.

6. After an initial consideration of the proposed Pepsi Gang project, Pepsi LAD made a limited business decision to proceed with construction of certain molds, known as "tooling," from which sample Pepsi Gang figurines could be produced.

7. Pepsi LAD asked CDM to arrange for the production of the Pepsi Gang tooling and agreed to advance approximately $300,000 to CDM for the costs of the tooling. In agreeing to the production of the tooling, Pepsi LAD expressly limited its commitment to CDM to $300,000 for tooling costs. Pepsi LAD ultimately paid $345,000 to CDM for tooling costs and to cover a cost overrun.

8. Pepsi LAD and CDM also agreed, in writing, upon the manner in which Pepsi LAD ultimately would pay for production of the Pepsi Gang figurines if Pepsi LAD decided to proceed beyond the tooling stage. Among other things, Pepsi LAD and CDM agreed that if Pepsi LAD were to decide to go forward with the project, Pepsi LAD would first be required to issue a purchase order and post a letter of credit for the benefit of the entity that might ultimately be retained to manufacture the full number of figurines required.

9. CDM, without direction from Pepsi LAD, exercised its discretion to retain Dyna Toys to prepare the tooling. Dyna Toys, not a party to this action, is a Hong Kong company that manufactures toys and promotional merchandise similar to that manufactured by Merton. Dyna Toys, which typically was a competitor of Merton, cooperated with Merton on the tooling efforts for the Pepsi Gang project. Dyna Toys went out of business in 1994.

10. After having been paid for tooling by Pepsi LAD, CDM paid Dyna Toys. CDM was the only company with which Pepsi LAD had direct dealings on the contemplated Pepsi Gang project, and it never provided any authorization to Dyna Toys (or anybody else) to proceed beyond the tooling stage.

11. Pepsi LAD, the division within PepsiCo that actually was considering the proposed Pepsi Gang project, never had any dealings, or communicated in any fashion, with Merton.

12. After considering the potential advantages and disadvantages of the contemplated Pepsi Gang project, Pepsi LAD ultimately decided not to proceed with the project and did not pursue the project beyond the preliminary tooling stage. Pepsi LAD was the only entity that ultimately had the authority to decide whether to proceed.

13. At the time Merton was purchasing materials in connection with the proposed Pepsi Gang project, Pepsi LAD was not aware of the existence of Merton, as Merton had learned of the project from Dyna Toys, not Pepsi LAD.

14. Unbeknownst to PepsiCo or CDM, Dyna Toys had discussions on its own with Merton regarding the proposed Pepsi Gang

project. Dyna Toys apparently sought to subcontract to Merton a portion of the work it hoped to receive from CDM. Neither Pepsi LAD nor any other entity within the PepsiCo organization, either participated in, or authorized, whatever discussions took place between Dyna Toys and Merton.

15. Neither Pepsi LAD nor any other division or entity within the PepsiCo organization, provided any authorization to CDM or anyone else to proceed beyond the tooling stage. Merton was aware in 1991 that neither Pepsi LAD nor any other division or entity within the PepsiCo organization, ever issued a purchase order, or a letter of credit, in connection with the contemplated Pepsi Gang project.

16. Apparently based on its discussions in Hong Kong with Dyna Toys, Merton decided to produce for Dyna Toys certain gear subassemblies. To this end, from mid-October through mid-December of 1991, Merton purchased some 13,000,000 gear boxes to be used in the ultimate manufacture of Pepsi Gang figurines. These steps were not taken at the behest of PepsiCo or any of its divisions, and no contract, document or other writing exists reflecting any agreement between PepsiCo and Merton regarding the Pepsi Gang project.

17. While Merton and Dyna Toys were negotiating in 1991, Keller had been independently pursuing a business relationship with PepsiCo in Hong Kong. Keller had been given the name of Aileen Law, a Pepsi World Trade representative, who worked in its Hong Kong office on foreign currency and trade balances issues. Law was never formally affiliated with Pepsi LAD, although she knew individuals there. On occasion she talked with Pepsi LAD employees in connection with her responsibilities.

18. From time to time Law met on behalf of PepsiCo with prospective manufacturers and vendors in the Hong Kong area. The purpose was to identify possible vendors for PepsiCo and to assist PepsiCo in its currency and trade balance transactions.

19. Keller called Law, who met with him, at his request, for breakfast in mid-August, and visited Merton's factory in early September 1991. The purpose of these contacts was for Keller to acquaint Law with Merton's manufacturing capabilities and for Law to inspect the Merton plant. Keller did not mention the proposed Pepsi Gang project, or any other specific project, to Law at either of these meetings. At this time Law did not know about the proposed Pepsi Gang project which was being handled by Pepsi LAD and CDM.

20. After the factory visit, Keller called Law to say he had heard of a large project, whose name he did not know, that was related to PepsiCo and that used a substantial quantity of gear boxes. Law testified, and I credit her testimony, that Keller did not know the name of the project and Law informed Keller that she was not familiar with the project. Keller asked her to make inquiries and she agreed to do so. Mr. Keller did not mention that Merton was working with, or seeking to work with Dyna Toys, on the project. Law also testified that Keller never asked her to take any steps to assist Merton with any of its work.

21. Shortly after the call from Keller, Law independently learned of the Pepsi Gang project from Michael Pollack of Pepsi World Trade, who asked her to accompany him to a meeting with CDM. At that meeting the Pepsi Gang project was discussed and Law was asked to assist in seeing if hard currency could be generated through the project. Dyna Toys was represented at that meeting. Michael Pettit of CDM explained that Dyna Toys would be the designated factory representative if the project went through. Merton was not mentioned at the meeting.

22. Subsequently, Law received quotations on unrelated business from Merton, but the Pepsi Gang project was not discussed. The quotations did not lead to any business between Keller and Law. In December 1991 Keller called Law again. Keller testified that the purpose of the call was to ascertain if the project he was negotiating with Dyna Toys was a Pepsi project. Law, according to Keller, verified that the project was a Pepsi project. Keller, whose recollection of the conversation was somewhat incomplete, testified that although the size of the order and

Dyna Toys involvement was mentioned, there was no discussion of any price, style, delivery schedules or payment terms. Although Keller believes he understood Law to be telling him that Pepsi stood behind the project, this understanding was never confirmed orally or in any writing.

23. Law, whose recollection of the conversation was stronger and more detailed than Keller's, testified that Keller called her to tell her that Merton, having received a commitment from Dyna Toys was working on the Pepsi Gang project. She testified that Keller asked her for the first time if she had heard of the project, and she informed him that it was a project Pepsi was pursuing, but since the project was not in her area of responsibility, she did not know its status. Keller asked Law if she knew whether Pepsi had opened a letter of credit for the project and Law told Keller she did not know. In that conversation Law made no commitment to Merton to assist it, or to facilitate payment to Merton by others. Further, Law did not tell Keller that Pepsi would pay anything to Merton or that Pepsi would take any steps to see that Merton was paid by others. I credit this testimony.

24. By the time of Keller's December, 1991 conversation with Law, Merton already had performed the work which is the basis for its claims in this lawsuit. Keller does not recall whether he contemplated legal action against Dyna Toys as a result of the Pepsi Gang project.

25. Merton and Pepsi had no further communications until March 1992 when Merton sought the assistance of PepsiCo in attempting to obtain reimbursement from Dyna Toys for work Merton had done for Dyna Toys in connection with the Pepsi Gang project. Merton used Law and Mike Welton, one of her superiors from the New York offices of Pepsi World Trade, to try to arrange a meeting with Dyna Toys to discuss Merton's attempt to seek reimbursement from Dyna Toys. Welton was planning a visit to Hong Kong on other, unrelated business in the Spring of 1992. Dyna Toys, however, failed to attend the meeting with Merton. Then, as a courtesy to Merton, Welton and Law agreed to visit the Merton factory to view the gear boxes Merton had obtained. Welton agreed to try to help Merton, but he did not agree to pay Merton anything.

■ 26. Law and Welton's conversations with Merton during the Spring of 1992 came months after the activities for which Merton is seeking damages in this matter and did not constitute retroactive authorization for Merton's work for Dyna Toys in the Fall of 1991.

27. Merton commenced this proceeding against PepsiCo only after Dyna Toys, the company that supposedly encouraged Merton to engage in the activities in question, refused to reimburse Merton.

28. As this litigation has unfolded, Merton has sold or used all the gear boxes that were the principal subject of its original damage claim.

## B. CONCLUSIONS OF LAW

Merton seeks recovery under two theories. First, Merton claims that PepsiCo breached a contract with Merton when it discontinued the Pepsi Gang project and refused to pay Merton despite Law's statement to Keller that the project was a Pepsi project. Second, Merton alleges that as a result of Law's misleading statements about the Pepsi Gang project, Pepsico is liable under the theory of negligent misstatement.

1. This Court has subject matter jurisdiction over this litigation, based upon diversity of citizenship.

2. New York law applies to determine conflict of law issues. *Machleder v. Diaz,* 801 F.2d 46, 51 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987).

3. Applying New York conflict of law principles, Hong Kong law determines the respective rights and obligations. *Schultz v. Boy Scouts of America,* 65 N.Y.2d 189, 196–97, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985); *Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99 (1954).

4. In accordance with Chapter 88 of the Laws of Hong Kong, British law, both common and statutory, is the law of Hong Kong. Chapter 88, *Application of English Law Ordinance* (1966) § 3.

5. Applying principles of British contract law, the evidence fails to establish the existence of a contract. Under those principles, an agreement (even one that is collateral) is not binding if it lacks certainty, either because its terms are too vague or because it is obviously incomplete. See Chitty, J. *Chitty on Contracts, General Principles,* of Terms," § 123 at 90 (26th Ed.1989); *Treitel,* G.H. *The Law of Contract,* "Certainty," § 5 at 48 (3rd Ed.1970). At the outset, I credit Law's testimony that she was then not even aware of the Pepsi Gang project. However, even if Law confirmed the existence of a Pepsi Gang project, her fleeting response to Keller's generalized questions fails to amount to a "meeting of the minds" sufficient to form an enforceable contract between Merton and PepsiCo. Keller himself admitted that he and Law never even discussed, much less agreed on, essential terms such as price, quantities, shipping terms, payment terms or time for performance in the December 1991 phone conversation or in any other with Law.

6. Similarly, the evidence fails to establish PepsiCo's liability under the theory of negligent misstatement. Under British law, a negligent misrepresentation may give rise to liability for pecuniary loss in circumstances where a "special relationship" exists between the parties. *Hedley Byrne & Co. v. Heller Partners,* [1963] 2 All E.R. 575, 601 ("plaintiff cannot ... recover for financial loss caused by a careless statement unless he can show that the maker of the statement was under a special duty to him to be careful"). See also *Morgan Crucible v. Hill Samuel Bank,* [1991] 1 All E.R. 148, 149 (duty of care imposed where there was a relationship of proximity).

7. The evidence at trial plainly indicated that Merton and PepsiCo never had a "special relationship." Prior to the Pepsi Gang project, Merton had never had *any* business dealings with Pepsico. Keller had just met Law two months prior to the alleged misstatement and they had only limited introductory contacts. Their only face-to-face contact during those two months consisted of a solicitation breakfast meeting (at Keller's request), followed by a routine visit to the Merton factory. Moreover, any telephone conversations between Keller and Law in the time period between the factory visit and the September phone call could be characterized, at best, as vague inquiries about a Pepsi project which involved gear boxes. These two introductory meetings followed by nebulous conversations did not as a matter of law create a special relationship.

8. Further, even if Merton and Pepsico had a special relationship prior to the December phone call, Law's unspecific statements to Keller to the effect that Pepsi Gang project was a PepsiCo venture fails to amount to a misleading statement actionable under a theory of negligent misrepresentation.

9. Given this Court's decision that Merton has been unable to establish any liability on behalf of PepsiCo, it is not necessary to consider Merton's damage claims.

10. Were New York law to be applied, the Court would still conclude that Merton has not established the breach of a contract or the tort of negligent representation. *White v. Guarente,* 43 N.Y.2d 356, 362–63, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977); *T'AI Corp. v. Kalso Systemet, Inc.,* 568 F.2d 145 (10th Cir.1977) (applying New York law).

### CONCLUSION

For, the foregoing, reasons, this Court finds that PepsiCo is not liable to Merton. The complaint is dismissed.

The clerk is directed to enter judgment for defendant and against plaintiff in this action.

**SO ORDERED.**