**HBO, A DIVISION OF TIME WARNER ENTERTAINMENT COMPANY, L.P., Appellant,**

v.

**Dean HUCKABEE, Appellee.**

No. 14-96-01528-CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 27, 1998.

Peter Drew Kennedy, Julie Anne Ford, R. James George, Jr., Austin, for appellant.

Diana A. Marshall, J. Tynan Kelly, Houston, for appellee.

Before Justices YATES, MAURICE E. AMIDEI and EDELMAN.

## OPINION

MAURICE E. AMIDEI, Justice.

This appeal arises from a defamation suit brought by Dean Huckabee (Huckabee), appellee, against HBO, a Division of Time Warner Entertainment Company, L.P. (HBO), Lee Grant, Virginia Cotts, Joseph Feury Productions, Inc., and Home Box Office, Inc. The trial court denied the motion for summary judgment filed by appellants.[1] We reverse and render.

## I. FACTS

This is a defamation case arising out of a film, *Women on Trial,* broadcast by HBO in October of 1992. The film was made by Lee Grant and her husband's production company, Joseph Feury Production, Inc. Originally, the film was to be a documentary about divorce in general; however, after Grant and Virginia Cotts, a co-producer and researcher for the project, visited Houston, the focus of the film changed.

Ultimately, the film focused on four stories arising out of Texas courts. Three of the stories dealt with cases in the Houston family courts. The theme of the produc-

1. Huckabee brought suit against all defendants except HBO, a division of Time Warner Entertainment Company, L.P., before the effective date of section 51.014(6) of the Texas Civil Practice and Remedies Code, *See* Tex.Civ. Prac. & Rem.Code Ann. § 51.014(6) (Vernon Supp.1997). Section 51.014(6) states that a person may appeal from an interlocutory order of a district court, county court at law, or county court that "denies a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media ... arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article 1, Section 8, of the Texas Constitution, or Chapter 73." *Id.* Therefore, the only defendant entitled to bring an interlocutory appeal is HBO, a division of Time Warner Entertainment Company, L.P. *See Time Warner Entertainment Co., L.P. v. Hebert,* 916 S.W.2d 47, 48 (Tex.App.—Houston [1st Dist .] 1996, no writ) (holding that under section 51.014(6) only a defendant sued after effective date of statute could seek interlocutory review); *see also* Act of May 25, 1993, 73rd Leg., R.S., ch 855, § 3, 1993 Tex. Gen.Laws 3365, 3366 (legislation enacting section 51.014(6) that states the section shall not apply to any matters in litigation prior to the effective date of the act).

tion was stated in the narration of the film: "When a woman dares to fight for the safety of her child, she is in danger of having that child taken away." The film gave voice to women who believed they were treated unfairly by the courts. Two of those women who appeared in *Women on Trial* had their cases heard in former Judge Dean Huckabee's court: Sandi Hebert and Ivy Raschke.

The Hebert and Raschke stories were similar. In both cases, the women came to court with allegations of abuse by the fathers of their children. Both women lost custody of their children, and contact with the children was terminated. In telling these stories, the creators and producers relied on interviews with the mothers, support groups, attorneys, child protective service personnel, a reporter, a police officer, a court-appointed psychologist, and appellee. They also reviewed documents related to each case.

After the film aired, appellee filed suit alleging the film was defamatory, unfairly and falsely criticizing his decisions in the Hebert and Raschke cases. Appellant filed a motion for summary judgment, which was denied by the trial court. Appellant then perfected this appeal.

## II. STANDARD OF REVIEW

■ The same standard of review which governs the granting of a summary judgment applies to the denial of a summary judgment. *See Harris County v. Ochoa*, 881 S.W.2d 884, 886 (Tex.App.—Houston [14th Dist.] 1994, writ denied); *Ervin v. James*, 874 S.W.2d 713, 715 (Tex. App.—Houston [14th Dist.] 1994, writ denied); *see also Oden v. Reader*, 935 S.W.2d 470, 474 (Tex.App.—Tyler 1996, no writ); *San Antonio Express News v. Dracos*, 922 S.W.2d 242, 247 (Tex.App.—San Antonio 1996, no writ); *Freedom Communications, Inc. v. Brand*, 907 S.W.2d 614, 617 (Tex. App.—Corpus Christi 1995, no writ). Additionally, the same summary judgment standard applied in other cases is applicable in defamation actions. *See Casso v.*

*Brand,* 776 S.W.2d 551, 557 (Tex.1989) (rejecting a more liberal summary judgment standard in public figure defamation cases); *see also Delta Air Lines, Inc. v. Norris,* 949 S.W.2d 422, 425 (Tex.App.—Waco 1997, writ denied).

Summary judgment for a defendant is proper only when the defendant negates at least one element of each of the plaintiff's theories of recovery or pleads and conclusively establishes each element of an affirmative defense. *See Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex. 1997) (citing *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979)). When reviewing a summary judgment, the appellate court must take as true all evidence favorable to the nonmovant and indulge every reasonable inference in the nonmovant's favor. *See Science Spectrum,* 941 S.W.2d at 911 (citing *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546 (Tex.1985)). If the movant's motion and summary judgment proof facially establishes its right to judgment as a matter of law, then the burden shifts to the nonmovant. *See City of Houston,* 589 S.W.2d at 678.

■ Where, as here, the trial court's order does not specify the grounds relied on for its ruling, the court of appeals will reverse and render judgment if any of the grounds in the motion has merit. *See Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625 (Tex.1996); *State Farm Fire & Cas. Co. v. S.S.,* 858 S.W.2d 374, 380 (Tex.1993).

## III. SUMMARY JUDGMENT GROUNDS

In this appeal, appellant raises seven points of error alleging it is entitled to summary judgment on the following grounds: (1) the film, *Women on Trial,* is "core political speech" and cannot be grounds for a defamation claim because the statements contained therein are not

objectively verifiable, and further, are protected opinion under the First Amendment of the United States Constitution and article I, section 8 of the Texas Constitution; (2) all statements of fact in the film are true or substantially true, and other statements in the film are protected opinion under the First Amendment of the United States Constitution, article I, section 8 of the Texas Constitution, and section 73.002(2)(b) of the Texas Civil Practice and Remedies Code; (3) the film, *Women on Trial,* is privileged as a fair and reasonable comment on, or criticism of, an official act of a public official and a matter of public concern under section 73.002(2)(b) of the Texas Civil Practice and Remedies Code; (4) appellee's claim that the film, *Women on Trial,* injured him because of omissions and editing choices amounts to a claim for false light, which has been rejected by the Texas Supreme Court; (5) appellee was a public official and the summary judgment proof conclusively negated the essential element of actual malice; and (6) the promotional spots do not contain false statements of fact about appellee; rather they are true or are opinion protected under the First Amendment of the United States Constitution, article I, section 8 of the Texas Constitution, and section 73.002(2)(b) of the Texas Civil Practice and Remedies Code.[2] By these complaints, appellant contends it disproved at least one essential element of appellee's claim or otherwise showed he could not succeed on any theory pled. *See Rosas v. Buddies Food Store,* 518 S.W.2d 534, 537 (Tex. 1975).

**2.** Point of error one is a *"Malooly"* point. *See Malooly Brothers, Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970) (a point of error that complains "the trial court erred in granting the motion for summary judgment" is sufficient to allow argument as to all possible grounds upon which summary judgment should have been denied or granted); *see also Plexchem Int'l, Inc. v. Harris County Appraisal Dist.,* 922 S.W.2d 930, 930–31 (Tex.1996); *Loyd v. ECO Resources, Inc.,* 956 S.W.2d 110, 120 n. 1 (Tex.App.—Houston [14th Dist.]

## A. PUBLIC OFFICIAL AND ACTUAL MALICE

In point of error six, appellant contends the trial court erred in denying its motion for summary judgment because appellee was a public official, and the summary judgment proof established that no statement about appellee was published with actual malice. Appellee claims appellant failed to establish, as a matter of law, that there is no genuine issue of material fact as to whether the statements were published with actual malice.

In *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964), the United States Supreme Court first held that the First and Fourteenth Amendments to the United States Constitution require a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to the performance of official duties without clear and convincing proof that the statement was made with actual malice. *See also Casso,* 776 S.W.2d at 558; *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex. 1989) (recognizing the same rule in Texas courts). In the present case, both sides agree that appellee, an elected district judge, was a public official when the broadcast aired. Accordingly, to merit summary judgment, appellant had to conclusively negate the element of actual malice.

"Actual malice," as that term is used in defamation cases, is a term of art that is separate and distinct from traditional common-law notions of malice. *See Casso,* 776 S.W.2d at 558; *Brady v. Cox Enters., Inc.,* 782 S.W.2d 272, 276 (Tex.

1997, no writ). Although this first point of error is sufficient to preserve argument on all possible grounds upon which appellant alleges summary judgment should have been granted, appellant raises six additional points of error containing specific complaints about the trial court's order denying their motion for summary judgment. By addressing these six points individually, we will be addressing point of error one. Accordingly, we find it unnecessary to specifically reference point of error one in the opinion.

App.—Austin 1989, writ denied). It does not include ill will, spite, or evil motive; rather, it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 328, 94 S.Ct. 2997, 3001, 41 L.Ed.2d 789 (1974); *Gonzales v. Hearst Corp.,* 930 S.W.2d 275, 277 (Tex.App.—Houston [14th Dist.] 1996, no writ). "Reckless disregard" is defined as a high degree of awareness of probable falsity, and the evidence must show that the defendant in fact entertained serious doubts as to the truth of the publication. *See St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Casso,* 776 S.W.2d at 558. This stringent standard is imposed upon plaintiffs to prevent a chilling effect on the uninhibited debate of public issues. *See Ross v. Labatt,* 894 S.W.2d 393, 395 (Tex. App.—San Antonio 1994, writ dism'd w.o.j.).

Before 1989, the law was clear that an affidavit of an interested witness, usually the alleged defamer, as to his or her state of mind, even if uncontroverted, was not sufficient to negate actual malice and support a summary judgment. *See Bessent v. Times–Herald Printing Co.,* 709 S.W.2d 635 (Tex.1986); *Beaumont Enterprise & Journal v. Smith,* 687 S.W.2d 729 (Tex. 1985). The decisions in *Bessent* and *Beaumont Enterprise* made summary judgment virtually impossible to obtain in defamation cases because the movant's burden of showing the absence of malice was unreachable. *See Casso,* 776 S.W.2d at 557; *Hailey v. KTBS, Inc.,* 935 S.W.2d 857, 860 (Tex.App.—Texarkana 1996, no writ). The supreme court, however, overruled *Bessent* and *Beaumont Enterprise* in 1989 when it issued its decision in *Casso.* 776 S.W.2d at 559.

The Texas summary judgment rule permits the granting of a summary judgment on the basis of uncontroverted testimony of an interested witness as long as that evidence "is clear, positive and direct, otherwise credible and free from contradic-

tions and inconsistencies and could have been readily controverted." *See Casso,* 776 S.W.2d at 558 (quoting Tex.R.Civ.P. 166a(c)). The supreme court reasoned that the decisions in *Bessent* and *Beaumont Enterprise* applied the final prong of rule 166a(c) too literally, interpreting the phrase "could have been readily controverted" to mean that the movant's summary judgment proof could have been easily and conveniently rebutted. *See Casso,* 776 S.W.2d at 558. This caused summary judgment in defamation cases to become more difficult to obtain, even as the plaintiff's opportunity to prevail on the merits became more remote. *Id.* The court held that the more reasoned interpretation of "could have been readily controverted" was that the testimony at issue is of a nature that can be effectively countered by opposing evidence. *Id.; see also Trico Technologies Corp. v. Montiel,* 949 S.W.2d 308, 310 (Tex.1997). If the credibility of the affiant or deponent is likely to be dispositive, then summary judgment is not appropriate; however, if the non-movant must come forward with independent evidence to prevail, the summary judgment may well be proper in the absence of such controverting proof. *Id.*

In defamation cases, it is not enough for the jury to disbelieve the defendant's testimony. *See Casso,* 776 S.W.2d at 558. In a trial, the plaintiff must prove by clear and convincing evidence that the declarant acted with actual malice. *Id.* Thus, because the credibility of the alleged defamer, the probable affiant or deponent in a summary judgment case, is not the dispositive factor, summary judgment may be proper in the absence of controverting proof. The supreme court concluded that, as in all other types of cases, summary judgment motions in defamation cases should not be denied merely because of a subjective determination that the movant's proof cannot be readily controverted. *Id.* at 559.

From the time of *Casso,* countless Texas courts have found affidavits sufficient to negate the element of actual malice, there-

by supporting summary judgment in defamation cases when those affidavits were uncontroverted. *See, e.g., Rogers v. Cassidy,* 946 S.W.2d 439, 446 (Tex.App.—Corpus Christi 1997, no writ); *Morris v. Dallas Morning News, Inc.,* 934 S.W.2d 410, 421 (Tex.App.—Waco 1996, writ denied); *Dracos,* 922 S.W.2d at 256; *Brand,* 907 S.W.2d at 622; *Labatt,* 894 S.W.2d at 396–97; *Johnson v. Southwestern Newspapers Corp.,* 855 S.W.2d 182, 187–88 (Tex.App.—Amarillo 1993, writ denied); *Brady,* 782 S.W.2d at 276. The present case is no exception.

■ To negate actual malice, appellant submitted affidavits from several persons involved with the *Women on Trial* project: (1) Virginia Cotts, co-producer and principal researcher for the documentary; (2) Lee Grant, officer of Joseph Feury Production, Inc., director and narrator of the documentary; and (3) Cis Wilson, vice-president of original programming for HBO, who worked with Lee Grant and Joseph Feury Production, Inc. on the documentary. In her affidavit, Cotts described how she first heard about the Hebert and Raschke cases, and the initial steps taken in researching the project. She then detailed who was interviewed and filmed for the documentary. She also specifically described the steps she took to confirm her understanding of the Hebert and Raschke cases:

a. Interviews and follow-up questions with Rusty Hardin on the *Hebert* case.

b. Review of Sandi Hebert's and Ivy Raschke's files relating to their respective cases.

c. Review of the transcript of the March 1988 hearing and documents relating to the appeal of the temporary order in the *Hebert* case, and review of the transcript on the issue of temporary custody in the *Roberts/Raschke* case.

d. Interviews and follow-up questions with Sandi Hebert, and with Ivy Raschke and her children, Derek and Sacha.

e. Interview of Sherry Turner, the police officer who first interviewed Wayne Hebert on videotape about the abuse.

f. Interview of the two attorneys who had represented Sandi Hebert at the March 1988 hearing, Dinah Bailey and Beth McGregor, both of whom said they had experience in prosecuting child abuse cases.

g. Review of the two videotapes of interviews of Wayne Hebert that were introduced into evidence at the March 1988 hearing in which Wayne said his father caused the injury to his penis.

h. Follow-up questions to Rusty Hardin, Sherry Turner and Marinelle Timmons about the videotapes of Wayne Hebert and about the opinions of Kit Harrison regarding his theory of the abuse. I also read articles dealing with the issue of children's outcries and recanting and I consulted with my mother, who is a licensed child psychiatrist who has been in practice for more than 25 years, about these issues. I discussed these topics with representatives of groups such as the National Center for Protective Parents, A.R.C.H. (Alliance for the Rights of Children) and Mothers Alliance for the Rights of Children.

i. Review of a deposition of Kit Harrison which was given in the Hebert case.

j. Follow-up questions with Marinelle Timmons and Randy Burton about the Roberts/Raschke case.

k. Review of material describing the problems and controversy about the ability and willingness of Children's's Protective Services to protect children from harm. I also interviewed Randy Burton, a lawyer who is an active leader of a citizens's group working to prevent child

abuse. Attachment A is a true and correct copy of material provided to me by Randy Burton.

l. Review of articles and materials concerning problems with child welfare agencies nationally. Discussions with attorney Joan Pennington and social worker Prudence Glass concerning the limitations of child welfare agencies nationally.

m. Review of newspaper articles describing problems and the perception of the public of the family law courts and some of the lawyers, including Earl Lilly, who had become successful working within that Court system. Attached as Attachment B are true and correct copies of the articles I read.

n. Interviews with Susan Alverson, a member of Justice For Children, and Melanie Harrell and others involved in the citizens group called Court Watch.

4. Throughout the process of filming, and for months after filming, I continued to ask follow-up questions and obtain documents to confirm that my understanding of what had occurred in each of the cases was correct. A review of the files retained by JFP [Joseph Feury Productions, Inc.] of this process indicates that I have reviewed and obtained copies of approximately 2,000 pages of documents relating to the Texas cases I was researching.

Finally, Cotts testified in her affidavit about her belief in the truth of the documentary and the statements therein relevant to appellee:

9. All of the interviews and documents confirmed that my initial understanding of what happened in the *Hebert* case was substantially correct. I believe the film's description of that case was an accurate summary and I had no doubt that every-thing in the film about that case was true.

10. I believed that the description in the film about the *Raschke/Roberts* case was a truthful summary of what happened in that case, and I believe all of the statements about that case were true. I believe that all of the statements about Judge Huckabee in that segment, as in the entire film, were true. In particular, I believed that Judge Huckabee gave custody to the father on a temporary basis, and would not let Ivy tell her children goodbye. I also believed that Ivy and Steve Raschke thought they never had a chance at the trial, because the ad litem, the court-appointed psychologist and the Judge had decided Ivy Raschke should not have custody. I believe that after that trial, Judge Huckabee took away Ivy's rights to see or talk to her children, and she did not see them for three years.

11. At the time *Women on Trial* was broadcast, I believed all of the statements in that film were true. I had no doubts about the truth of any of the statements. In particular, I believed the statements about Judge Dean Huckabee were true, and I had no doubts about the truth of those statements.

12. Prior to learning about Sandi Hebert's case and the *Roberts/Raschke* case, I had no knowledge of Judge Huckabee. Although I disagreed with his decisions I harbored no ill will, animosity, hatred or malice towards Judge Huckabee. None of the statements in *Women on Trial* were made to deliberately harm Judge Huckabee.

This affidavit is sufficient to establish that Cotts believed the statements in the documentary were true, or she did not have a high degree of awareness as to their falsity. An affidavit setting forth the absence of actual malice is sufficient to

carry the movant's summary judgment burden of proof. *See Casso,* 776 S.W.2d at 558; *Carr,* 776 S.W.2d at 571; *Dracos,* 922 S.W.2d at 256. Appellant, however, also provided two additional affidavits to negate the element of actual malice.

In her affidavit, Lee Grant testified that she supervised the process of the research, filming, and editing of the documentary. She stated that she wrote the narration and approved any changes that were made. Grant described the sources relied on for the segments concerning the Hebert and Raschke cases, and stated she relied on Cotts to verify the accounts given by those sources. She also swore that she did not know any statement about appellee was false, and that she did not have doubts about the truth of any statement relative to appellee. She also stated that she is still not aware that any statement made about appellee is false.

Appellant also submitted an affidavit from Cis Wilson, vice-president of programming for HBO. She began her affidavit by stating that it was her responsibility to work with independent producers to develop subjects for HBO documentaries, and that she worked with Lee Grant and Joseph Feury Productions, Inc., in connection the *Women on Trial.* Wilson stated she relied on Grant and the production company to ensure the documentary was accurate, but she was generally aware that steps were being taken to ensure the content was truthful. Finally, Wilson stated she believed the statements in the documentary were true and had no doubts as to the truth of any of the statements. In particular, she stated she had no doubts about the truth of any statements concerning appellee.

The combination of this summary judgment evidence is clearly sufficient to negate the element of actual malice. *Id.* These affidavits confirm that those acting on behalf of appellant thought the information in the documentary was true or that they did not have a high degree of awareness as to the falsity of the information. By negating actual malice, appellant established its right to judgment as a matter of law. *See Casso,* 776 S.W.2d at 558; *Labatt,* 894 S.W.2d at 395. Once appellant established its right to judgment, the burden shifted to appellee to offer sufficient summary judgment proof to raise an issue of fact on the question of actual malice. *See Rogers,* 946 S.W.2d at 446; *Labatt,* 894 S.W.2d at 396; *Schauer v. Memorial Care Sys.,* 856 S.W.2d 437, 450 (Tex.App.—Houston [1st Dist.] 1993, no writ); *see also City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979) (holding that once movant established right to summary judgment, burden shifts to nonmovant to demonstrate otherwise); Tex.R.Civ.P. 166a(c).

■ To overcome appellant's entitlement to judgment, appellee had to offer specific, affirmative proof to show that appellant either knew the publication was false or entertained serious doubts as to its truth. *See Dracos,* 922 S.W.2d at 256; *Howell v. Hecht,* 821 S.W.2d 627, 631 (Tex. App.—Dallas 1991, writ denied). Appellee contends that he provided controverting proof sufficient to raise an issue of fact concerning actual malice. Appellee first points to testimony and exhibits in the depositions of HBO producers Sheila Nevins and Cis Wilson. Specifically, appellee points to evidence that shows that: (1) the film was under continuous review by appellant's legal department; (2) Joseph Feury Productions, Inc. demanded and received indemnification from appellant against defamation actions; (3) "legal problems" put the film on hold in April of 1992, and legal review was the "main work" on the film through July of that year. This evidence, even when viewed in the light most favorable to appellee, does not raise a fact issue as to the existence of actual malice. The evidence, which we have reviewed in its entirety, shows only that the legal department took a protracted amount of time to review *Women on Trial.* It does not show that the legal review was based on fears that statements

in the documentary were untrue and were known to be untrue by those involved in the production. Appellee's suspicions about the reasons appellant's legal department chose to "continuously" review the film and decided to indemnify Joseph Feury Productions, Inc. is not sufficient to raise a material issue of fact. *See Schauer,* 856 S.W.2d at 450 (holding that mere surmise or suspicion of malice does not carry the probative force necessary to form the basis of a legal inference of malice) (citing *International & G.N.R. Co. v. Edmundson,* 222 S.W. 181, 185 (Tex. Comm'n App.1920, holding approved)).

█ Appellee next states that "constant rewrites were based on serious substantive concerns." He says that a written comment by Wilson to Cotts on the draft narration stating that they should give the men's side of the story is somehow indicative of appellant's knowledge that statements in the documentary were untrue. We disagree.

In every publication, particularly in one limited in broadcast time, certain editorial decisions and choices must be made. Possible disagreement over content between one of appellant's programming vice-presidents and other parties involved in the production does not suggest that either appellant or anyone else believed that the statements actually chosen for inclusion in the documentary were untrue. As the United States Supreme Court stated:

> The choice of material to go into a newspaper, and *the decisions made as to* limitation on the size and content of the paper, and *treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment.* It has yet to be demonstrated how governmental regulation of this crucial process can be exercised with First Amendment guarantees of a free press as they have evolved to this time.

*Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 2840, 41 L.Ed.2d 730 (1974) (emphasis added); *see*

*also Machleder v. Diaz,* 801 F.2d 46, 53 (2d Cir.1986) ("[A] rule that would hold a media defendant liable for broadcasting truthful statements and actions because it failed to include additional facts that might have cast the plaintiff in a more favorable or balanced light ... violates the First Amendment.").

We hold that the editorial choice to exclude certain information, in this case, interviews of the alleged abusive fathers, is not specific, affirmative proof that shows appellant knew the publication was false or entertained serious doubts about its truthfulness. Appellant's decision to exclude certain information from the documentary is a protected exercise of editorial control and judgment, not evidence of actual malice. *See Tornillo,* 418 U.S. at 258, 94 S.Ct. at 2840; *Machleder,* 801 F.2d at 53.

Appellee next contends that Wilson admitted she knew an HBO promotional spot was untrue, contradicting her affidavit that she knew of no untrue statements. The statement, that all four cases contained in the video occurred in a single family court in Texas, was contained in a promotional spot for the documentary. This promotional spot was not part of the film and contained no statements about appellee.

There is no contradiction between Wilson's affidavit and her admission concerning the promotional spot. In her affidavit, Wilson stated that she knew of no false statements "in the film." The promotional spot that Wilson admitted she knew was untrue did not appear in the documentary; rather, the statement was changed to "in one family courthouse in one county." While this statement is also untrue (one of the stories occurred in Bee County, not Harris County), appellee has presented no evidence that Wilson knew this statement was untrue.

█ Appellee also points to an alleged conflict between appellant and Grant concerning the ultimate focus of the documentary. Apparently, he is arguing that appellant decided, against Grant's wishes, to

exclude both sides and merely focus on the stories told by the women about a "corrupt judge," but delayed telling Grant so she could gain an interview with appellee without telling him the true focus of the documentary.

■ Assuming, as we must, that this is true, it is not evidence of actual malice. Appellant's tactics in obtaining an interview with appellee, however, unscrupulous, do not suggest, much less prove, that it or anyone else involved with the documentary believed the statements in the documentary were untrue. Neither ill will, spite, nor evil motive is proof of actual malice. *See Gertz*, 418 U.S. at 328, 94 S.Ct. at 3001; *Gonzales*, 930 S.W.2d at 277. Moreover, the fact that Grant disagreed with Huckabee over what actually occurred in the Hebert and Raschke cases, on problems in the family court system in general, and other aspects of the various issues does not prove that Grant or any other person involved in the production of *Women on Trial* knew the statements in the film were untrue or acted with reckless disregard. At most, this was no more than a difference of opinion and a choice as to who should be believed.

■ Finally, appellee argues that the key facts showing actual malice revolve around the identity of the actual perpetrator in the Hebert case. Appellee argues that Grant "knew" that appellee did not believe that the father in the Hebert case was the perpetrator of the child abuse. Appellee also takes issue with the fact that the "film just showed Huckabee's conclusion that he could 'sleep' after the decision, but suppressed any and all mention of the [sic] Huckabee's reason's [sic] of the decision."

First, the true identity of the actual perpetrator is irrelevant. What is relevant is whether appellant knew the father was not the abuser, but nevertheless stated he was and further stated that appellee knew it. Appellee has presented no evidence that appellant, Grant, Cotts, or anyone else

working on the documentary knew the father was not the abuser. Appellee's belief as to the identity of the perpetrator, and appellant's knowledge of that belief, proves only that appellant knew appellee believed he was right. It does not prove appellant knew the statements in the film were false.

■ Second, appellant's decision to omit appellee's reasoning for making his decision in the Hebert case is no proof of actual malice. As we have stated, editorial choices are protected by the First Amendment, and are not proof of actual malice. *See Tornillo*, 418 U.S. at 258, 94 S.Ct. at 2840; *Machleder*, 801 F.2d at 53. The portion of Cotts' affidavit relied on by appellee merely shows that she was aware there was a possibility that the father was not the abuser, but then affirmatively states she never doubted that he was. This does not suggest that Cotts knew the statements in the film relevant to the Hebert case were untrue or that she acted with reckless disregard of the truth.

■ Appellee, in an attempt to show actual malice, posed the following questions in his brief: "What if Huckabee was right? What if the injury occurred in Sandi Hebert's house? If it did, was not Huckabee *obligated* for the safety of Wayne to remove him from the environment in which he suffered a validated sexual injury?" Assuming the answer was "yes" to each one of these questions, it means appellee was correct. It does not mean, however, that appellant or those who worked on the project knew or believed he was right. Actual malice cannot be inferred from falsity of the challenged statements alone. *See Dracos*, 922 S.W.2d at 255; *Martin v. Southwestern Elec. Power Co.*, 860 S.W.2d 197, 200 (Tex.App.— Texarkana 1993, writ denied).

After a thorough review of the parties' arguments and the summary judgment proof, we hold appellant presented sufficient evidence to disprove actual malice as a matter of law. We also hold that appellee presented no controverting proof that

appellant believed that the statements in question were false or published with disregard for the truth. We sustain appellant's sixth point of error.

### B. REMAINING GROUNDS

 When a summary judgment order does not specify the grounds upon which the ruling was made, the reviewing court will affirm the judgment if any one of the theories advanced in the motion are meritorious. *See State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex.1993); *Carr*, 776 S.W.2d at 569; *Hall v. Tomball Nursing Ctr., Inc.*, 926 S.W.2d 617, 619 (Tex.App.—Houston [14th Dist.] 1996, no writ). By analogy, on appeal from the denial of a summary judgment, we may reverse and render judgment if any of the grounds stated in the movant's motion are meritorious. Because we have determined that appellant negated the element of actual malice, we need not consider the other grounds raised in the motion and in this appeal. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex.1996) (holding that courts of appeals should consider all summary judgment grounds that are *necessary* for final disposition of the appeal).

### IV. CONCLUSION

Texas has long been committed to free speech. In fact, one of the contributing factors that led to the Texas revolution for independence from Mexico was the desire for free speech. *See Labatt*, 894 S.W.2d at 394 (citing ROBERT A. CALVERT AND ARNOLDO DE LEON. THE HISTORY OF TEXAS, 56–58 (1990); JOURNAL OF THE CONSTITUTIONAL CONVENTION, 62 (1875); JOHN SAYLES, INTRODUCTION TO THE TEXAS CONSTITUTION, 129–35 (4th ed. 1893); Robert E. Hall, *Remonstrance—Citizen's Weapon Against Government's Indifference*, 68 TEX.L.REV. 1409, 1412–21 (1990); Arvel Ponton III, *Sources of Liberty in the Texas Bill of Rights*, 20 ST. MARY'S L.J. 93, 100 (1988)). Throughout all of the versions of the Texas Constitution, the framers rejected language similar to that contained in the United States Constitution, which is written only to *restrict* the government's ability to abridge free speech. *See Labatt*, 894 S.W.2d at 394 (emphasis added). Texas, instead, chose free speech language that *affirmatively* granted to the people the right to free speech. *Id.* (emphasis added). This suggests a desire by Texans to ensure broad liberty of speech. *Id.* (citing *Davenport v. Garcia*, 834 S.W.2d 4, 8 (Tex. 1992); *Casso*, 776 S.W.2d at 556; *O'Quinn v. State Bar of Texas*, 763 S.W.2d 397, 401 (Tex.1988)). In keeping with this tradition, Texas courts have required a nonmovant in a summary judgment case to come forward with specific, concrete evidence of actual malice to defeat summary judgment once the movant has negated that element as a matter of law. *See Dracos*, 922 S.W.2d at 256; *Howell*, 821 S.W.2d at 631. In this case, the evidence presented by appellee was insufficient to raise a fact issue on the element of actual malice. Accordingly, we reverse the trial court's judgment and render judgment in favor of appellant.

EDELMAN, J., concurs in the result only.