James A. EVANS and Kenneth
R. Lorton, Appellants,

v.

Wayne DOLCEFINO;  Capital Cities/ABC
National Television Sales, Inc.;  and
KTRK Television, Inc., Appellees.

Wayne Dolcefino;  Capital Cities/ABC
National Television Sales, Inc.;  and
KTRK Television, Inc., Appellants,

v.

Lawrence E. Lahaie, Jr., Appellee.

No. 01–97–00545–CV

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 28, 1999.

Charles L. Babcock, N. David Bleisch, Susan Weiss Davidson, Houston, for Appellants.

Thomas A. Dickens, Houston, for Appellees.

Panel consists of Chief Justice SCHNEIDER and Justices WILSON and SMITH.*

\* The Honorable Jackson B. Smith, Jr., retired justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. The trial court granted the media defendants' motion for summary judgment as to claims made by building inspectors James A. Evans and Kenneth R. Lorton. After the media defendants filed this appeal, this Court received an appeal bond

**OPINION**

MICHAEL H. SCHNEIDER, Chief Justice.

This is an interlocutory appeal brought by Wayne Dolcefino, Capital Cities/ABC National Television Sales, Inc., and KTRK Television, Inc. (collectively, "the media defendants") from the denial of their motion for summary judgment in a libel case. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(6) (Vernon Supp.1999). Lawrence E. LaHaie, Jr. (LaHaie), a building inspector for the City of Houston, sued the media defendants alleging that he was libeled by a series of 23 news broadcasts that were first aired on September 7, 1993, and continued into 1994. LaHaie also alleged claims for intentional infliction of emotional distress, tortious interference with employment relations, and negligence/gross negligence. The trial court granted the media defendants' motion for summary judgment as to claims by two of the building inspectors named in the broadcasts,[1] but denied summary judgment as to LaHaie's claims. The media defendants filed this interlocutory appeal. We reverse and render judgment that LaHaie take nothing on his claims.

## I. FACTS

### A. The "tip" and the hidden video

In July 1993, KTRK reporter, Wayne Dolcefino, received an anonymous tip that city building inspectors were receiving free meals at Charlie's Restaurant. On July 19, 1993, the anonymous tipper, who was later revealed to be Charlie's head waiter, Tim Kidd, called back and said that three building inspectors were eating lunch at the restaurant. Dolcefino and a cameraman, Noe Cadena, took a concealed camera to Charlie's and shot footage of city building inspectors Jim Evans, Kenneth Lorton, and LaHaie eating at Charlie's. After the inspectors left, their

from Evans and Lorton. However, Evans and Lorton never filed a record or a brief. On September 17, 1998, Evans and Lorton filed a motion to dismiss their cross-appeal. The motion was granted. Accordingly, this Court will only address the propriety of the summary judgment as it relates to LaHaie's claims.

waiter, Joseph Chubb, confirmed that the three did not receive a check because they were friends with the owner, Albert Kalas.

## B. The September 7, 1993 broadcast

After obtaining the hidden video footage, Dolcefino conducted an investigation that culminated in the following broadcast, which we include in its entirety.

[Anchor Dave Ward]: Good evening friends. Shara Fryer has the night off and Marvin Zindler is on special assignment. A two-month long 13 Undercover investigation tonight has sparked a corruption probe at Houston's City Hall and the target, possible ethics violations in the City's Building Department.

[Anchor Melanie Lawson]: Wayne Dolcefino is joining us tonight to start laying out the details of what we found. Wayne?

[Dolcefino]: Yeah, Melanie and Dave. Building inspectors have tremendous power. The power to decide whether a building is safe enough to open for business, safe enough for you and your children to enter. The City's top building official freely admits many of their decisions are judgment calls. Judgment that's not supposed to be colored by any inappropriate relationships. That's why we began our journey into the free lunch.

It's lunch time at Charlie's Coffee Shop in Montrose and in an area away from the crowd, three men eat and drink. [Hidden video footage shown at this point]. What they don't know is our hidden camera is sitting just across the room. Waiters say these are no strangers to the place.

[Charlie's waiter Kidd]: They started out with drinks, bloody mary, uh, Corona beer, appetizers at about $6.00 a plate.

[Dolcefino]: And then the main meal. The waiter will come back often to the table.

[Charlie's waiter Perkins]: I mean they just run me ragged.

[Dolcefino]: What's our interest on this July afternoon? Sitting at the table under our surveillance are two of the City's top building officials: Jim Evans, Chief of Plan Examining, and Kenneth Lorton, Chief of Occupancy and Life Safety. Two men who control many of the necessary permits for construction and remodeling in town; the men who decide, in fact, if buildings are safe enough to open for business. Between them they have 30 years with the City. The third man is building inspector Lawrence LaHaie. We were trying to confirm what present and former Charlie's waiters had been telling 13 Undercover. That City building inspectors have been eating at Charlie's for years, accepting what we now estimate are thousands of dollars in free meals.

[Charlies' waiter Kidd]: Their average bill would be between $60—for two of them—between $60 and up to $90. They have never paid a check; there's not a waiter that's ever worked there, past, present, that'll ever have taken any money from them to go to the cashier to make them pay their bill.

[Charlie's waiter Perkins]: And I said "Well, how come?" And he said well they're building inspectors and we don't charge them for their meal.

[Charlie's waiter Stewart]: The manager, Leo, would tell me, "Let me have their check when they're finished."

[Dolcefino]: This is Leo. Charlie's cashier.

[Charlie's cashier, Leo Klonis]: . . . . and I don't have nothin' to say. Please.

[Dolcefino]: Are they getting free meals here?

[Klonis]: Well, I don't know nothing about that.

[Dolcefino]: Have you seen the inspectors here?

[Klonis]: I don't know who the inspectors you're talking about.

[Dolcefino]: But with our hidden camera we confirmed the allegation. [Hidden video shown]. The City building officials left a small tip, but they never got a check. We called over the waiter to ask about it.

[Cameraman Noe Cadena]: I didn't see them pay the bill. Did you give them a bill?

[Charlie's waiter Chubb]: Oh, they're friends with the owner.

[Dolcefino]: The owner of Charlie's restaurant is this man, Albert Kalas. Who ac-

cording to the tax rolls has $2.3 million in business property in town. Among his reported holdings, some of Houston's oldest downtown hotels. They require safety permits to stay open. Kalas says the seven present and former waiters who detailed the thousands in free meals for us, are lying and so is our hidden camera video. [Hidden video shown].

[Kalas]: They always ... they always pay for it. The only one has authority to give them anything is me. If I'm there with them, if I know somebody and I want to give some food away, that's my business. I don't think it's anybody else's business.

[Dolcefino]: During the 10 days we kept the place under surveillance, the inspectors returned three times. [Hidden video shown]. Drinking alcohol inside while their City vehicles stay outside. That alone is a violation of City policy. But accepting free meals can be far more serious.

[James Evans]: I have no comment.

[Dolcefino]: All four of the inspectors we watched at Charlie's refused to talk with 13 Undercover, but we caught up with Jim Evans at the City offices on Main Street. Do you think it's proper to accept gifts from the people whose permits you approve?

[Evans]: I don't accept gifts, sir.

[Dolcefino]: Do you accept free meals?

[Evans]: No sir.

[Dolcefino]: Well, the waiters at Charlie's say you've been eating free there for at least three years, two to three times a week.

[Evans]: They're wrong.

[Dolcefino]: Inspector LaHaie admitted to 13 Undercover that he drank liquor while assigned a City vehicle, but claims he only accepted six free meals in three years at Charlie's. [Hidden video shown]. We spotted him at Charlie's twice in 10 days, and he didn't pay on either occasion. LaHaie claimed Jim Evans and Kenneth Lorton were there a lot more than he was. Lorton walked away when he saw our camera coming. Mr. Lorton?

[Lorton]: Yes.

[Dolcefino]: Oh, I'm Wayne Dolcefino with Channel 13.

[Lorton]: I can't talk to you right now.

[Charlie's waiter Kidd]: I don't have any paperwork to prove it, but I did it. I know that they were getting fed free because they were allowing bad building code practices to exist. It must be.

[Dolcefino]: Charlie's waiters may not have the paperwork to dig deeper, but we do. Since we first asked for building inspection records for the properties linked to Charlie's owner Albert Kalas, the inspectors have suddenly stopped going there for lunch. Tomorrow we'll start connecting the dots for you at home. Dave and Melanie.

[Anchor Dave Ward]: As Marvin says, no such thing as a free lunch. Right, Wayne? Okay. Thanks, Wayne.

## C. The subsequent broadcasts

LaHaie was only mentioned by name in the very first broadcast. However, the hidden video footage was shown in several of the subsequent broadcasts. Each time the footage was shown, a reference was made to the hidden camera video, which gave rise to Dolcefino's investigation. The subsequent broadcasts focused on the fact that several downtown hotels, which were owned by Charlie's owner, Albert Kalas, were allowed to remain open despite fire safety violations. As a result of Dolcefino's report, the mayor ordered new inspections of four hotels owned by Kalas. Dolcefino also reported that four inspectors, including Evans and Lorton, were under investigation by Houston's Public Integrity Review Group and were being reassigned to the Parks and Recreation Department. LaHaie was not named by Dolcefino as one of the four inspectors under investigation, although LaHaie was investigated and then reassigned also.

Dolcefino soon expanded his investigation beyond Kalas and the investigators captured on the hidden video to explore allegations of more widespread corruption in the City's building department. He reported that employees of the building department received gifts in the form of cash and restaurant

coupons, and that some companies seemed to receive unusually expedited service from the building department. Dolcefino also investigated whether members of Deputy Public Works Director, Horace Cude's family received preferential treatment from the building department.

As stated earlier, LaHaie was not mentioned in any broadcast but the first, and that whenever his photo was shown, it was in the context of the "hidden video" that sparked an ethics probe of the City's building department.

### D. Consequences of the broadcasts

LaHaie, Lorton, and Evans were transferred to the Parks and Recreation Department. They were also investigated by the Public Integrity Review Group of the Houston Police Department. The Public Integrity Review Group recommended that criminal charges be brought, but the district attorney's office declined to prosecute. Nevertheless, Lorton and Evans received temporary suspensions and LaHaie received a reprimand. Lorton and Evans appealed the disciplinary action in a Civil Service Commission hearing; the commission upheld the disciplinary actions. LaHaie filed a grievance; his reprimand was upheld and he did not pursue an appeal before the Civil Service Commission.

### E. This lawsuit

LaHaie, Lorton, and Evans (the libel plaintiffs) filed suit against the media defendants alleging libel, intentional infliction of emotional distress, tortious interference with business relations, and negligence/gross negligence. On November 27, 1996, the media defendants filed a motion for summary judgment. On January 3, 1997, the libel plaintiffs filed their response. On January 10, 1997, the media defendants filed another motion for summary judgment contending that claims arising out of the December 2, 1993 broadcast were barred by limitations. On January 28, 1997, the libel plaintiffs filed a response to both motions for summary judgment. On February 6, 1997, the media defendants filed reply briefs in support of both motions.

A hearing was held on March 21, 1997. On April 30, 1997, the trial judge granted summary judgment in favor of the media defendants on all claims raised by Evans and Lorton. However, she denied summary judgment on LaHaie's claims.

The media defendants brought this interlocutory appeal contending that the trial court erred by denying summary judgment on LaHaie's claims. They argue that: (1) the broadcasts were substantially true (point of error one); (2) LaHaie is a public official and that they acted without actual malice (points of error two and four); (3) Dolcefino's statements were conditionally privileged (point of error three); (4) LaHaie's tort claims must fail because they are the same as his libel claim (points of error five through nine); (5) National Television Sales was not involved with the broadcast and cannot be liable (point of error 10); and (6) claims arising out of the December 2, 1993 broadcast are time barred (point of error 11). LaHaie brings two cross-points alleging: (1) that the trial court erred in denying his motion to substitute a proper party (cross-point one), and (2) that the interlocutory appeal statute is unconstitutional (cross-point two).

## II. LAHAIE'S CROSS-POINTS

### A. Constitutionality of interlocutory appeal statute

■ In cross-point of error two, LaHaie contends that TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(6) (Vernon Supp.1999), which provides a media defendant the right to bring an interlocutory appeal from the denial of a summary judgment, is unconstitutional. Specifically, LaHaie argues that the statute unfairly "discriminates against individuals in order to protect the media." This Court has already considered, and rejected, LaHaie's argument in *KTRK Television, Inc. v. Fowkes*, 981 S.W.2d 779, 784–86 (Tex.App. Houston [1st Dist.] 1998, pet. filed). For the same reasons, we overrule LaHaie's cross-point of error two.

### B. Scope of interlocutory appeal

■ Having held that the interlocutory appeal statute is constitutional, we must now

consider the scope of the jurisdiction conferred on this Court by the statute. Specifically, we must decide whether we have jurisdiction to consider LaHaie's cross-point of error one, in which he contends that the trial court erred by overruling his motion to join a proper party.

In *TSM AM–FM TV v. Meca Homes, Inc.*, 969 S.W.2d 448, 450 (Tex.App.—El Paso 1998, pet. denied), the trial court denied the media defendant's motion for summary judgment, and also denied the libel plaintiff's motion for summary judgment. The media defendant brought an interlocutory appeal under article 51.014(6), and the libel plaintiff brought cross-points attacking the denial of his own motion for summary judgment. *Id.* The court held that section 51.014(6) did not confer jurisdiction over claims on appeal by libel plaintiffs. *Id.*

> [T]he legislative history of the statute reveals that Section 51.014(6) was not intended to inure to the benefit of a plaintiff who claimed to have been libeled or slandered by the media. The purpose of the section was to allow a newspaper, radio station, or television station that was sued for libel to make an immediate appeal of a judge's refusal to grant a summary judgment. By providing for an interlocutory appeal, Section 51.014(6) permitted the courts to sort out unmeritorious libel cases before the cases entered the time-consuming and expensive trial phase.

*Id.* at 451 (citation omitted). Accordingly, the court in *Meca Homes* held that it had no jurisdiction to consider the cross-claims brought by the libel plaintiffs. *Id.*

In *Rogers v. Cassidy*, 946 S.W.2d 439, 443 (Tex.App.—Corpus Christi 1997, no writ), the media defendant brought an interlocutory appeal after its motion for summary judgment was denied. The libel plaintiff brought a separate appeal, in which she complained that the trial court erred by denying her motion for summary judgment. Again, the court held that a plaintiff in a libel suit has no right to bring an appeal when its summary judgment against a media defendant is denied. *Id.*

In *KTRK Television, Inc. v. Fowkes*, 981 S.W.2d at 786–87, this Court held that section 51.014(6) did not confer jurisdiction on this Court to consider claims by libel plaintiffs. Accordingly, we decline to address LaHaie's cross-point of error regarding joinder of a proper party.

## III. DENIAL OF SUMMARY JUDGMENT

### A. Standard of review of summary judgment

The same standard of review that governs the granting of a summary judgment applies to the denial of a summary judgment. *Ervin v. James*, 874 S.W.2d 713, 715 (Tex. App.—Houston [14th Dist.] 1994, writ denied). The movant for summary judgment must show there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex.1985). In deciding whether there is a disputed material fact issue precluding summary judgment, we take evidence favorable to the nonmovant as true. *Id.* at 548–49. We also indulge every reasonable inference in favor of the nonmovant and resolve any doubts in his favor. *Id.* at 549. If the movant's motion for summary judgment proof facially establishes his right as a matter of law, then the burden shifts to the nonmovant to raise fact issues precluding summary judgment. *Ervin*, 874 S.W.2d at 715. A defendant, to be entitled to summary judgment, must disprove at least one essential element of each pleaded cause of action or otherwise show the plaintiff could not succeed on any theory pleaded. *San Antonio Express News v. Dracos*, 922 S.W.2d 242, 247 (Tex.App.—San Antonio 1996, no writ).

### B. Libel claim

#### 1. Truth or substantial truth standard

In their first point of error, the media defendants claim the trial court erred in denying their motion for summary judgment because, as a matter of law, the complained of broadcasts were true or substantially true. Thus, the media defendants argue that they have successfully negated an element, *i.e.*, falsity, of LaHaie's libel claim.

To maintain a defamation cause of action, the plaintiff must prove that the defendant (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998). A showing of substantial truth in a summary judgment case will defeat a defamation claim. *McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex.1990). Section 73.005 of the Civil Practice and Remedies Code provides, "[T]he truth of the statement in the publication on which an action for libel is based is a defense to the action." TEX. CIV. PRAC. & REM.CODE § 73.005 (Vernon 1986). To determine substantial truth, we are to consider whether the defamatory statement was more damaging to the plaintiff in the mind of the average reader than a true statement would have been. *Barbouti v. Hearst Corp.*, 927 S.W.2d 37, 65 (Tex.App.—Houston [1st Dist.] 1996, writ denied). This evaluation involves looking at the "gist" of the broadcast. *McIlvain*, 794 S.W.2d at 16; *KTRK Television v. Felder*, 950 S.W.2d 100, 105–106 (Tex.App.—Houston [1st Dist.] 1997, no writ). If the underlying facts as to the gist of the libelous charge are undisputed, then we can disregard any variance with respect to items of secondary importance and determine substantial truth as a matter of law. *McIlvain*, 794 S.W.2d at 16; *Felder*, 950 S.W.2d at 106. "It is not the function of the court to serve as senior editor to determine if the reporting is absolutely, literally true; substantial truth is sufficient." *San Antonio Express News v. Dracos*, 922 S.W.2d 242, 249 (Tex.App.—San Antonio 1996, no writ) (quoting *Wavell v. Caller–Times Publishing Co.*, 809 S.W.2d 633, 636 (Tex.App.—Corpus Christi 1991, writ denied)).

### 2. The "gist" of the broadcast

In this case, the "gist" of the alleged libel, as seen in the statements from the September 7, 1993 broadcast, is as follows:

(1) City building officials Jim Evans, Kenneth Lorton, and Lawrence LaHaie were videotaped eating lunch at Charlie's Restaurant.

(2) Lorton and Evans decide whether buildings are safe enough to open.

(3) Charlie's waiters report that building inspectors regularly eat free at Charlie's.

(4) On the day the hidden video was shot, Evans, Lorton, and LaHaie did not pay for their own lunch.

(5) Albert Kalas is the owner of Charlie's restaurant as well as several downtown hotels; his properties require permits from the building department in order to remain open.

(6) Kalas and Evans denied the free lunches; Lorton refused to talk to Dolcefino; LaHaie admitted accepting free lunches, though he claimed to do so less frequently than either Evans or Lorton.

(7) The 13 Undercover story sparked a corruption probe targeting possible ethics violations in the building department.

The summary judgment evidence conclusively establishes that these statements are substantially true. The record contains the hidden camera video, which was taken in Charlie's Restaurant. It clearly shows Jim Evans, Kenneth Lorton, and Lawrence LaHaie eating lunch. The men are surrounded with empty plates and bottles. The first item above is substantially true.

The summary judgment evidence shows that at the time, Evans was the Chief of Plan Review, Lorton was the Chief of Occupancy Inspection, and LaHaie was a Senior Occupancy Inspector. As such, they were responsible for issuing permits for businesses to remain open in Houston. The second item above is substantially true.

Several waiters from Charlie's, including Tim Kidd, Joseph Chubb, and Wesley Stewart, provided sworn statements in which they stated that building inspectors were allowed to eat free at Charlie's at the direction of the owner, Albert Kalas. The third item above is substantially true.

Joseph Chubb provided uncontroverted evidence that, on the day the hidden video was shot, Evans, Lorton, and LaHaie did not pay for their meal. The fourth item above is substantially true.

The summary judgment evidence shows that Albert Kalas was the owner of Charlie's Restaurant, as well as several downtown hotels including The Montague, The La Monte, The Star, and The King George. All of these businesses required occupancy permits from the City in order to remain open. The fifth item above is substantially true.

The footage from the first broadcast shows that Albert Kalas and Jim Evans initially denied the free lunches, and that Kenneth Lorton declined to comment. It should be noted that later in the investigation, all three admitted either giving or accepting free lunches, although they maintained that they violated no law or ethical rule in doing so. In his deposition, LaHaie admitted taking free lunches from Charlie's. The sixth item above is substantially true.

There is also summary judgment evidence that after the broadcasts aired, the Public Integrity Review Group of the Houston Police Department began an investigation of the building inspectors mentioned in the broadcast. Although the District Attorney ultimately declined to prosecute, Evans, Lorton, and LaHaie were disciplined. Evans and Lorton received temporary suspensions and LaHaie was reprimanded. All three were transferred to a different department. The seventh item above is substantially true.

Thus, we hold that the "gist" of the initial September 7, 1993 broadcast was substantially true.

### 3. Statements about LaHaie

■ The media defendants argue that the only broadcast actionable by LaHaie is the initial September 7, 1993 broadcast because he was only mentioned by name in that single broadcast. LaHaie argues that all of the broadcasts are actionable because the hidden video, which contained his picture, was shown during several of the subsequent broadcasts, and the broadcasts often referred to "city inspectors" or "inspectors" as a group.

■ A plaintiff may only assert a claim for defamation based on statements about himself. *Newspapers, Inc. v. Matthews,* 161 Tex. 284, 339 S.W.2d 890, 893–94 (Tex.1960). A libel plaintiff does not have to be named in a publication as long as those who know and are acquainted with him understand that the defamatory publication referred to him. *Id.* at 894. However, a member of a group has no cause of action for a defamatory statement directed to some or less than all of the group when there is nothing to single out the plaintiff. *Eskew v. Plantation Foods, Inc.,* 905 S.W.2d 461, 462 (Tex.App.—Waco 1995, no writ); *Wright v. Rosenbaum,* 344 S.W.2d 228, 231–32 (Tex. Civ.App.—Houston 1961, no writ). Thus, this Court must decide to what extent the subsequent broadcasts, which did not mention LaHaie, were "of and concerning" LaHaie.

We have viewed all of the complained of broadcasts. LaHaie is mentioned only in the first broadcast. Fourteen of the remaining 23 broadcasts did not mention LaHaie, but did show the hidden video footage. The hidden video footage served to single out LaHaie from the group of "inspectors" referred to in the broadcasts. However, each time the footage singling out LaHaie was shown, it was in the context of building inspectors accepting free lunches. Therefore, not all of the statements made on the remaining broadcasts were about LaHaie, only those statements accusing building inspectors of accepting free lunches. We have already held that the "free lunch" allegations were substantially true.

### 4. Libel by implication

■ LaHaie also argues that the broadcasts were actionable because of "the numerous reasonable inferences from the broadcasts that Evans, Lorton, and LaHaie were accepting meals in exchange for giving favorable inspections." The notion that a plaintiff can assert a cause of action for libel by implication, where the facts stated are substantially true, has been rejected by the Texas Supreme Court. *See Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex.1995) (court rejected contention that statements, although literally true, were slanderous because others might infer dishonesty). Moreover, this Court has held "the implications of a true statement, however unfortunate, do not vitiate an affirmative defense of truth." *Hardwick v. Houston*

*Lighting and Power Co.,* 943 S.W.2d 183, 185 (Tex.App.—Houston [1st Dist.] 1997, no writ). To hold otherwise would chill the reporting of factual news because one might always infer negative implications from an event that actually occurred. *Fowkes,* 981 S.W.2d at 789. Thus, the media defendants in this case cannot be held liable because the broadcasts, which we have held to be substantially true, implied some wrongdoing by LaHaie.

**5. Effect of editing decisions on substantial truth**

██ LaHaie also alleges that Dolcefino's editing decisions show that the broadcasts were not substantially true. He specifically points to a portion of an interview that Dolcefino conducted with Hal Caton, the head of the building department. Caton told Dolcefino that an occupancy permit approved by Evans appeared "atypical." LaHaie claims that Dolcefino should have included the rest of Caton's remarks because it explained his remark that the permit appeared "atypical." Thus, the crux of LaHaie's complaint is that even though Dolcefino correctly reported Caton's statement, he chose to edit out statements favorable to the libel plaintiffs.

In *HBO v. Huckabee,* No. 14–96–01528–CV, slip op. at 18, 1998 WL 889828 (Tex. App.—Houston [14th Dist.], August 27, 1998, no pet.), the libel plaintiff claimed that the media defendant's choice to exclude certain information from the broadcast was evidence of actual malice. The court disagreed and held that the media's decision to exclude certain information from its broadcast was "a protected exercise of editorial control and judgment, not evidence of actual malice." *Id.*

██ We similarly believe that the media *defendant's decision to exclude certain information from a broadcast does not render an* otherwise truthful statement false. "[A] rule that would hold a media defendant liable for broadcasting truthful statements and actions because it failed to include additional facts that might have cast the plaintiff in a more favorable or balanced light ... violates the First Amendment." *Machleder v. Diaz,* 801 F.2d 46, 53 (2d Cir.1986).

**6. Statements of opinion protected**

██ At oral argument, LaHaie's counsel specifically referred to a portion of the broadcast wherein Charlie's waiter, Tim Kidd, stated: "I don't have any paperwork to prove it, but I did it [failed to charge building inspectors]. I know that they were getting fed free because they were allowing bad building code practices to exist. It must be." LaHaie claims that this statement was untrue, thus libelous.

██ An essential element of libel "is that the alleged defamatory statement must be a statement of fact rather than an opinion." *Howell v. Hecht,* 821 S.W.2d 627, 631 (Tex.App.—Dallas 1991, writ denied). All assertions of opinion are protected by the first amendment of the United States Constitution and article I, section 8 of the Texas Constitution. *Carr v. Brasher,* 776 S.W.2d 567, 570 (Tex.1989).

Taken in context, Kidd's statements are an opinion as to why the building inspectors were allowed to eat free at Charlie's Restaurant. The portion of the statement wherein Kidd says, "It must be," shows that he was speculating, or giving his opinion, as to why the inspectors were allowed to eat free. Because Kidd was merely giving his opinion, the statement is protected.

**7. Conclusion**

The "gist" of the initial September 7, 1993 broadcast was substantially true. To the extent that the remaining broadcasts were about LaHaie (*i.e.,* they showed his picture and referenced the "free lunches") those broadcasts were also substantially true. Also, statements containing assertions of opinion are protected, thus, not libelous. Therefore, we conclude that the trial court erred by denying the media defendants' motion for summary judgment on LaHaie's libel claim. Accordingly, we sustain point of error one. In light of our holding on point of error one, we need not address points of error two, three, and four, and decline to do so.

**C. Non-libel claims**

**1. Intentional infliction of emotional distress, tortious interference with contract, and negligence/gross negligence**

In points of error five, seven, and nine, the media defendants contend the trial court erred by denying their motions for summary judgment on LaHaie's claims of intentional infliction of emotional distress, tortious interference with employment relationship, and negligence/gross negligence. Specifically, the media defendants argue that because LaHaie's libel claim fails, his tort claims must also fail.

In this case, we agree. LaHaie's second amended original petition alleges no tortious conduct separate and apart from the allegedly libelous broadcasts. When a non-libel claim is grounded on the same speech giving rise to a libel claim, a plaintiff must prove the falsity of the alleged libelous speech. *See Felder*, 950 S.W.2d at 108; *see also Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988); *Eimann v. Soldier of Fortune Magazine, Inc.*, 680 F.Supp. 863, 866 n. 3 (S.D.Tex. 1988). To hold otherwise would permit litigants to circumvent constitutional defenses against the tort of libel by pleading torts that do not require falsity or actual malice. Because we have previously concluded that the broadcasts, as they related to LaHaie, were substantially true, LaHaie's non-libel tort claims must fail.

Accordingly, we sustain points of error five, seven, and nine. In light of our holding on points of error five, seven, and nine, we need not address points of error six and eight, and decline to do so.

### 2. Liability of National Television Sales

In point of error 10, the media defendants contend the trial court erred by denying National Television Sales's motion for summary judgment on the grounds that National Television Sales had no involvement with the broadcasts. However, we have already held that the trial court erred by denying the motion for summary judgment on other grounds, thus, we need not address this point of error, and decline to do so.

### 3. Limitations as to the December 2, 1993 Broadcast

On December 2, 1993, Channel 13 anchor Shara Fryer introduced a story on the conditions of the Star Hotel by stating, " ... months ago we brought you a series of reports on downtown hotels where city building inspectors looked the other way toward a free lunch." In point of error 11, the media defendants argue that any cause of action arising out of this broadcast is time barred because LaHaie first complained of the broadcast in his response to the motion for summary judgment, which was filed over two years after the broadcast.

We need not address this issue because we have already held that only broadcasts mentioning LaHaie or otherwise singling him out from other inspectors in the building department are actionable. The December 2, 1993 broadcast did neither, but merely referred to "city building inspectors" as a group. A member of a group has no cause of action for defamation directed at less than all of the group unless the libelous statement singles him out. *Eskew*, 905 S.W.2d at 462; *Wright*, 344 S.W.2d at 231–32.

### IV. CONCLUSION

Because we have held that the broadcasts complained of, as they concern LaHaie, are substantially true, we reverse the judgment of the trial court and render judgment that LaHaie take nothing from the media defendants.